COURT OF APPEALS

                                       SECOND DISTRICT OF TEXAS

                                                   FORT WORTH

 

 

                                        NO.
2-09-215-CV

 

IN THE
INTEREST OF A.B.                                                     

AND H.B., CHILDREN



 

                                              ------------

 

           FROM THE 322ND DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I. 
Introduction








In four
issues, Appellant Father appeals the trial court=s order
terminating his parental rights to his children, A.B. and H.B.  Father argues that legally and factually
insufficient evidence exists to support termination of his parental rights
under Texas Family Code sections 161.001(1)(D) and (E)[2]
and to support a finding that termination of his parental rights is in the
children=s best
interest.  See Tex. Fam. Code Ann.
' 161.001(1)(D),
(E) (Vernon 2008).  Father also contends
that the trial court violated his due process rights by denying him access to
expert witness fees.  Because the evidence
is factually insufficient to support termination of Father=s
parental rights under either (D) or (E), we will reverse the trial court=s
termination judgment and remand this case for a new trial.

II.  Factual
Background[3]

A.     Mother and Father=s
Marriage[4] and
Domestic Violence in Missouri

Mother
and Father met on a telephone chat line and dated for approximately one year
before they married on February 18, 2005. 
Mother is from Texas, and Father is from Missouri, so they bounced back
and forth between the two states for a while. 

 

 

 

 








1.     Mother=s
Testimony[5]

Mother
said that when they lived in Missouri, Father hit her more than once and pushed
her.  Mother said that the domestic
violence consisted of both arguing and physical confrontation and that she
probably hit Father while defending herself. 
Mother never called the police or made a report, she never went to a
battered women=s shelter, and Father never was
arrested for domestic violence in Missouri. 

2.     Father=s
Testimony

Father
said that during his first year of marriage to Mother, the police were never
called out to their apartment for loud arguments or fighting because there was
no domestic violence.  Father also
testified that he did not strike Mother but that she struck him. 

B.     A.B.=s Birth

1.     Mother=s
Testimony

Mother
testified that A.B. was born in Missouri in April 2005.








2.     Father=s
Testimony

A.B. was
born with the umbilical cord around his neck, but he was a healthy baby.  Father said that they took A.B. to the doctor
regularly and that his only hospital visit was the one at the center of this
case, which is discussed below. 

C.     Missouri CPS Investigation

1.     Mother=s
Testimony

While
Mother and Father lived in Missouri, CPS investigated them because A.B. had
cradle cap and a rash and because their house was dirty.  Mother felt that the allegations were
false.  She said that Father called CPS
quite often because he wanted them to close the case and that he was harassing
the caseworker with an inappropriate tone of voice.  Mother said that the CPS caseworker made a
surprise visit to their home due to Father=s phone
calls to their office.  Mother and Father
thereafter moved to Texas. 

2.     Father=s
Testimony

CPS
became involved with Mother and Father while they lived in Missouri, but Father
said that A[CPS] realized that the
referrals that were made were false.  And
so, after a two- to three-day period, they closed out the case.  They did not offer any services or remove the
child.@ 

 








D.     The Move to Texas

When
Mother and Father moved to Texas, their first apartment was at the Regents Cove
Apartments near Westcreek Drive in Fort Worth. 
Mother worked, and Father worked sometimes; however, they worked
different shifts so that they could take care of A.B. 

E.     H.B.=s Birth

H.B. was
born June 25, 2006, in Fort Worth and weighed six pounds, twelve ounces.  Father worked when H.B. was born until Mother
could go back to work. 

F.      Domestic Violence in Texas

1.     Mother=s
Testimony

After
they moved to Texas, Father continued to yell at Mother, and she yelled
back.  While Mother was pregnant with
H.B., Father hit her and pushed her; she would not hit back or push back but
would instead go to another room. After Mother gave birth to H.B., she and
Father continued to argue off and on.

Mother
said that she never instigated the physical altercations.  The domestic violence occurred Aonce
every several months@ and did not always involve
physical violence.  Mother said that the
children were present but that Father was never physically violent to them. 

 








2.     Father=s
Testimony

Father
said that there were no fights or violence prior to his separation from Mother,
and the police were never called to their apartment.  Father said that they Afussed
over [money] a lot@ but that it never came to the
point where he became violent with Mother. 
Father said that if they had arguments, they did not have them in front
of the children. 

G.     Separation

1.     Mother=s
Testimony

Mother left
Father in approximately July 2007 because he was abusive. When she separated
from Father, Mother moved in with her sister and brother-in-law, Jennifer and
Gary W., in Mansfield for a month.[6]  Mother testified that Jennifer W. did not
take care of the children while Mother worked.[7]  Instead, Mother took the children to Father=s
apartment while she worked in Fort Worth at Sprint from 3:00 p.m. to midnight
because Father was not employed; he received Social Security disability
payments for ADHD. 








Mother
rented her own apartment in Bedford in August 2007.  After Mother moved into her own apartment,
Mother and Father watched the children.[8]


2.     Father=s
Testimony

H.B. was
two years old and A.B. was three when Mother and Father separated.  Father said that when Mother received an $800
check from Sprint, she decided to leave him. 
She went to Mansfield to live with her sister.  Father said that Mother=s
leaving Akind of
hurt@ but
that he could not force her to stay.     During
the entire separation, Father watched the children a couple of hours during the
week but not on a consistent basis. 
Jennifer W. watched the children while Mother worked.  Father did not keep the children overnight
because he was having maintenance issues with his apartment.  Father said that there was a hole in the
bathroom ceiling through which bugs were coming in, and the dishwasher was
broken. 








After
Mother had lived with her sister for about a month, she then moved to
Bedford.  Father said that after Mother
moved to Bedford, he saw the children the same amount of time (a couple of
hours a week on an inconsistent basis); Jennifer W. continued to keep the
children while Mother was at work. Father said that he did not keep the
children for a weekend because he did not want them to be in his apartment that
long due to the maintenance issues. 

H.     Father=s Mental
Illness

1.     Mother=s
Testimony

Father
told Mother that he was bipolar.  He was
taking Welbutrin before they got married, but then he stopped.  Mother noted that Father was very angry and
more argumentative when he was not taking his medication.  Mother had also reported to the children=s
doctors that Father had Tourette=s
Syndrome, insomnia, ADHD, and a history of seizures as an infant. 

2.     Father=s
Testimony

Father
testified that he was diagnosed with ADHD as a child and spent most of his
childhoodCfrom a very early age to
adulthoodCin CPS custody where he was
placed in sixteen or seventeen foster homes. 
Father admitted having emotional problems the majority of his adult life
Abecause
things haven=t been going the way I wanted
them to go as far as education and stuff.@  Father said that he might be depressed one day
and extremely happy the next day but that it never led Ato the
level of complete anger.@ 


 








I.      No Domestic Violence After the Separation

Mother
said that Father=s mood when she saw him daily
while dropping off the children was the same as when he was not on his
medication; he was angry, but he did not strike her.  Mother said that no physical violence
occurred during the times when she was dropping off the children and picking
them up from Father=s apartment.  Mother trusted Father with the children
despite the domestic violence that had occurred prior to the separation because
she Adid not
see anything, as far as the kids.@  From A.B.=s birth
in April 2005 throughout the time that Mother and Father were separated, Father
never harmed the children. 

J.      H.B.=s Growth
Issues

1.     Mother=s
Testimony

Mother
took the children to Cook=s Clinic for well-baby
check-ups.  Mother said that she and
Father took H.B. to the doctor before they separated and that she was the one
who took H.B. to the doctor after they separated. 








Mother
agreed that H.B. was pretty small and was not growing very fast but said that
H.B. was eating regularly during that time and did not appear to have any
problems health-wise.  Mother said that
she had talked to the doctors about H.B.=s slow
weight gain, and the doctors were under the impression that H.B. took after
Father, who had taken growth hormone shots in order to grow. The doctors did
not ask Mother to change H.B.=s
feedings.  Mother said that she did not
have a conversation with Jennifer W., or anyone else, about taking H.B. to the
doctor for weight issues.[9]


2.     Father=s
Testimony

Father
did not go to the doctor visit in May 2007 when H.B. was underweight and
falling off the growth chart;[10]
Mother said that H.B. was fine, so Father did not know that H.B. was
underweight.  Father said that H.B. was
born small, and he just thought that she was having a tough time growing and
that it took some children a little longer than others to develop. 








Father
said that he and Mother were not purposely doing anything that would have kept
H.B. from thriving.  H.B.=s
appetite was fine; she was eating Cheetos, crackers, and pizza.  Father said that they were always able to
keep the refrigerator, the freezer, and the cabinets stocked, and they always
made sure that their children ate. 

Father
agreed that H.B. was fifteen months old in September 2007 and that she was not
walking or crawling; she was trying to Ascoot.@  Father said that H.B. could sit up when she
was close enough to sit against the couch, but she could only sit up by herself
for a few seconds before falling over. 

K.     H.B.=s
Seizure

1.     Mother=s
Testimony

On September
29, 2007, Mother had been in Mansfield visiting with Jennifer W., and H.B. had
been outside most of the day.  Mother and
the children were at Mother=s
apartment when H.B. had a seizure.  H.B.
was conscious during the seizure, but her eyes rolled back in her head, and she
twitched.  Mother said that the EMS crew
saw H.B. having a seizure and that the seizures occurred repeatedly until H.B.
was at the hospital.  Mother said that
Father went to the hospital when H.B. was being treated. 

Mother
said that as a result of H.B.=s
hospital visit, the Texas Department of Family and Protective Services
(hereinafter Athe Department@ or ACPS@) became
involved.  After H.B. was released from
the hospital, the children went to live with Jennifer W. for eight or nine
months until they were returned to Father. 








2.     Paramedic=s
Testimony

Chris
Conner, a paramedic with the Bedford Fire Department, testified that on
September 29, 2007, at 9:58 p.m., he responded to a call that a child was
having a seizure.  When he arrived at
Mother=s
apartment,[11]
he found H.B. to be a little lethargic. 
Mother told him that H.B. was in her crib when Mother heard some noises;
H.B. started gasping for air and shaking her arms.  Mother said it looked like H.B. was having a
seizure, but she had no history of seizures. Conner could not tell whether H.B.
had suffered a seizure, but he immediately asked one of the firemen who came
with him to grab H.B. from Mother=s arms
and to take her out to the ambulance so that they could assess her. 








H.B. did
not have a seizure in Conner=s
presence, and her vital signs were all stable.  H.B. was acting fine physically, but she was
dehydrated and exhibited skin tartar, meaning that her skin felt Areal
elastic.@  Conner said that H.B. Alooked a
little underweight for her size@ but was
not emaciated, had an abrasion on her forehead that was in a healing stage, and
had Aa lot of
dirt on her,@ including dirt under her
fingernails.  Conner saw that there was a
lot of scabbing on her bottom and that there was some dried blood in her
diaper. 

Mother
told Conner that the abrasion on H.B.=s head
was caused by A.B. throwing a toy at her four days earlier and that H.B. had a
diaper rash that she had continued to scratch. 

Conner
advised Cook Children=s Hospital of the situation and
asked if they would call CPS.  His
largest concern was H.B.=s head injury because it was
unknown how severe the abrasion was and because Mother had admitted that she
did not take H.B. to the hospital to have it checked.  However, Conner believed that Mother=s
explanation for the injuryCthat
A.B. threw a toy, which hit H.B.=s headCwas
consistent with the injury. 

3.     Dr. Lazarus=s
Testimony








Dr.
Peter Lazarus, a pediatrician at Cook Children=s
Hospital, testified that H.B. was treated in the pediatric intensive care unit
(PICU) for seizures and was treated in his ward for failure to thrive.  The cause of H.B.=s
seizures was a chemical imbalance referred to as hypo low sodium.  It is not a chronic condition.  It would take hours to two or three days for
the condition to appear and be a danger. 
Dr. Lazarus said that he did not think that the condition could be
brought on by Mother=s giving the child a lot of
water after a day of activity in the warm weather.  When H.B.=s sodium
level normalized, her seizures stopped.  








H.B. was
diagnosed with Afailure to thrive@ because
her weight when she was admitted to the hospital, was fifteen pounds, and she
was fifteen months old at the time.  H.B.=s weight
put her well below the fifth percentile on the growth chart.  When asked if H.B.=s
failure-to-thrive condition would have been obvious two months before to
relatives who saw the child every day, Dr. Lazarus said that it would have been
less obvious to people who saw the child every day than it would have been to
someone who had not seen the child for three months.  Dr. Lazarus said that the medical records
showed that when H.B. was born, she was in the twenty-fifth percentile.[12]  Dr. Lazarus noted that H.B. had her
nine-month check-up on April 9, 2007, at a neighborhood clinic, and her weight
was in the tenth percentile.  Dr. Lazarus
said that falling from the twenty-fifth percentile at birth to the tenth
percentile nine months later is within the realm of normal because some
children Aare born bigger than their
genetic potential.@ 
He also said that sometimes it takes a while for children to get into
their normal growth channel, so falling one or two channels or growth curves is
not unusual.  But he said that if the
child was seen at twelve months and at fifteen months and growth was starting
to fall off, that would be alarming. 
When asked if he was concerned about H.B.=s health
because she was down below the growth chart, Dr. Lazarus said, AWell, it
certainly is not optimum growth.@ 

When
asked what the triggers are that let a parent know that the child is in danger
of not thriving, Dr. Lazarus said that the parents should find out at Awellcare@ or
routine baby care.  He did not know
whether the doctors at Cook=s Clinic
saw the triggers at H.B.=s check-up five or six months
before she presented to the hospital. 
Dr. Lazarus said that if the child was seen at twelve months, the
problem should have been addressed. 








After
she was hospitalized, H.B. began thriving. 
Because all of H.B.=s
metabolic screenings were normal, all the medical personnel did at the hospital
was properly feed her, which is what caused her to gain weight.  From September 29 to October 8, 2007, while
she was in the hospital, H.B. gained one pound, eleven ounces, which Dr.
Lazarus said was an Aextraordinary weight gain in the
hospital.@ 
During the nine months from the date that H.B. was hospitalized
(September 29) until her second birthday (June 25), she went from well below
the third percentile in weight to the seventy-fifth percentile, her length went
from well below the fifth percentile to the twenty-fifth percentile, and her
head circumference went from the third percentile to the fiftieth
percentile.  Dr. Lazarus said that H.B.=s weight
gain was Areally substantial@ and
told him that she was thriving.  These
improvements ruled out a hereditary cause for H.B.=s
failure to gain weight.  Dr. Lazarus had
a more solid medical opinion at trial than he had while H.B. was in the
hospital because he had received the results from her two-year checkup, so he
opined that H.B. was inadequately nourished when she presented on September 29,
2007. 

4.     CPS Investigator=s Testimony








Stacie
Hall, an investigator with CPS who worked in the night response or emergency
response unit, testified that she had received a referral on September 30,
2007, stating that H.B. had been brought to the hospital by EMS at
10:00 p.m. on September 29 for seizures. 
Hall went to the hospital about noon on September 30 to see H.B. and
noted that she appeared pale and very small for her age.  H.B. had a diaper rash and had an abrasion on
the right side of her forehead, which Mother said occurred when A.B. threw a
Buzz Lightyear toy at her head.[13]  Hall said that the medical personnel told her
that H.B. was admitted to the hospital because they had concerns about her
weight and the seizures that she was having. 

Mother
told Hall that on the day H.B. was taken to the emergency room, she had fed
H.B. half of a peanut butter and jelly sandwich around 10:00 a.m., along with
water and Sprite.  Between going to the
lake and then to her relatives= house,
Mother fed H.B. some crackers.  Mother
and Jennifer W. left the children in the care of Jennifer W.=s
mother-in-law, whom Mother assumed had fed H.B. something while they were
gone.  Mother told Hall that she and the
children had arrived home at around 7:00 p.m.[14]  While Mother was getting dinner ready, she
heard H.B. make Aa really strange noise.@  Mother looked and saw that H.B. was gasping
for air, that she was Adrooling really bad,@ and that
her left arm was twitching.  Mother
contacted her neighbor, and the neighbor told Mother to call EMS. 

Hall
also obtained some additional background on H.B. and her family from
Mother.  Mother said that H.B. weighed
six pounds, twelve ounces when she was born and that H.B.=s last
doctor visit was her thirteen-month well check-up. 








Mother
told Hall that she had been separated from Father for about two months, but
Mother did not mention who she had been living with while she was
separated.  Mother told Hall that during
the time that Mother and Father were separated, Father was still involved in
the children=s lives.  Mother said that Jennifer W. and another lady
helped watch the children while she worked; Mother never told Hall that Father
watched the children while she worked. 

Mother
initially denied any domestic violence but then said that Father had been
physically violent in the last six months of marriage, which is why she had
left him.  Mother told Hall that they had
a CPS referral for neglect when they lived in Missouri. 

When
Hall interviewed Father, he said that H.B. ate baby food out of a jar and drank
whole milk.  Father said that every now
and then he would give her some light potatoes or Alight
solvent,@ but he
did not explain what he meant by Alight
solvent.@ 








Father
said that he and Mother had been separated about two or three weeks but denied
that there was domestic violence in his relationship with Mother.  Father later said that Mother had assaulted
him once.  When Hall asked Father why Mother
would have said that he was hitting her, he told Hall that he was going to
court to file for child support because he kept the children most of the time[15]
(i.e., whenever Mother was at work). 

Hall
said that the case was found Areason
to believe for physical neglect@ due to
the fact that H.B. was underweight for her age, had poor gross motor skills,
was developmentally delayed, and had not been seen by a doctor since May;
because all of H.B.=s tests came back normal, the
Department determined that H.B.=s
condition was due to neglect.[16]


5.     Father=s
Testimony

Father
said that he became aware of the medical crisis with H.B. when Mother called
him from the hospital and told him that CPS was involved.  Mother told him, A[P]lease,
please don=t get upset with them.@  Father asked if he could speak with the
social worker, and that was when Hall had her conversation with Father. 








Father
did not go to the hospital until Monday because he did not have transportation
until that time.  H.B. was still in the PICU
when Father arrived. Father said that H.B. stayed there for three or four days
and then was transferred to a room. 
Father stayed at the hospital continuously while H.B. was there. 

Father
said that he had a problem with the formula that the doctor was giving H.B.
because it was causing her stomach to become bloated and making it hard for her
to have a bowel movement.  Father spoke
to the nurses, they ultimately changed the formula, and those problems went
away.  Father also had a problem with the
doctor=s not
informing him what was going on and not asking for Father=s
permission to treat H.B. 

L.      Voluntary Placement

1.     Hall=s
Testimony

Hall
recommended that the children be voluntarily placed with Jennifer W. and that a
case be opened with CPS to provide services to Mother and Father. Mother signed
an agreement stating that she would let her children stay with her sister.  Hall said that the voluntary placement kept
the children from going into foster care. 
A.B. was already staying with Jennifer W.,[17]
and H.B. was taken to Jennifer W.=s house
after she was discharged from the hospital. 

 

 








2.     Father=s
Testimony

Father
also signed the papers to allow his children to live with Jennifer W.; he
thought that if he did not allow his children to stay with her, he would lose
his parental rights because that is what the investigator told him.  CPS left it up to Jennifer W. to determine
when Father could visit, so Father was allowed to see his children only about
once a month.  Father admitted that he
did Aenough
complaining@ about not getting to see his
children that eventually, three or four months later, the caseworker set up
supervised visits at the CPS office instead of at Jennifer W.=s
residence.  After the visits were moved
to the CPS office, Father was allowed to visit with the children on a weekly
basis. 

3.     Jennifer W.=s
Testimony

Jennifer
W. testified that she kept the children from when H.B. was released from the
hospital through June 2008.  Jennifer W.
said that the children gained weight and that Early Childhood Intervention
services were offered to the children while they were in her home. 

M.     Father Worked Family-Based Safety Services
(FBSS)

1.     Father=s
Testimony








Father
said that he immediately wanted to get started on his service plan and that he Ajumped
right on it@ and Agot
[his] stuff done@ as soon as CPS issued the
necessary forms.  Father said that it
took about two months after the voluntary placement to start the plan.  Father said that during the time he was working
his FBSS, CPS made an unannounced visit to check on the condition of his
apartment, the sleeping arrangements, and the food that he had on hand.  

Father
took parenting classes with Janice Barker, who was with Volunteers of America
(VOA); he completed a psychological consultation with Dr. Parnell; and he
underwent a psychiatric evaluation with Dr. Yackulic at John Peter Smith
Hospital.  Father participated in
individual counseling with Norma Bartholomew and was supposed to have ten
sessions, but they mutually agreed to stop at the seventh session because there
was not a bond between them and because she was siding with CPS.  Father said that Judy Gaither was his anger
management instructor.  Father got along well
with Gaither because she took the time to listen and understand the situation
that he was in and Abasically didn=t just
throw [him] out the door.@ 
After Father completed his list of services, CPS gradually increased the
time that he was allowed to spend with his children. 

2.     Barker=s
Testimony








Barker
testified that in January 2008, she received a referral to provide services to
Father.  Barker went over parenting skills
and worked on budgeting and homemaking skills with Father.  Additionally, Barker provided transportation
to Father once a week so that he could visit with his children at CPS. 

Barker
said that Father was very hostile toward the services until she explained them;
at that point, he worked with the VOA but remained hostile to CPS during the
entire time that she worked with him. 
Barker said that Father talked about his CPS case Aquite a
bit,@ but he
never talked about going and getting his children to remove them.  When the trial court asked Barker if she ever
felt anxious while in Father=s
presence, she said that she had a good working relationship with Father and
that she did not feel like he was hostile toward her, only CPS, but she would
not have wanted to agitate him, especially while the children were there
because she could not have physically removed the children. 








The
issues that Barker identified in her first visit to Father=s
apartment were that there was very little food, there were no sheets on the
bed, and there were stains on the carpet;[18]
other than those issues, the apartment was clean. The only food that Father had
in the refrigerator was a small package of lunch meat and bread; the fact that
he had no fruits or vegetables was a concern. 
Father told Barker that he did not have food stamps for the children but
had only his own food stamp money. 
Father was very resistant to getting sheets and food because he did not
understand why CPS was pushing the issues since the children were not living
with him.  Barker explained to Father
that he had to put healthy food in his home to show CPS that he could provide
food in case the children were placed with him on any given day. 

From
February to March 2008, Father made progress by putting the sheets that the VOA
gave him on the bed and purchasing food. 
During later visits, Barker saw that the same food was there and had not
been touched.  But Barker agreed that it
was reasonable for Father to keep the food for when the children were returned
to him and that it was not unusual that the food was not eaten. 








Although
Father told Barker that he had never been diagnosed with anything, Barker noted
that Father paced around his apartment and talked about how his rights as a
father were being Avery violated@ and
that was why he had made an appointment at West Texas Legal Services.  Father did not understand why the children
were not placed with him after the problem occurred with H.B. while she was in
Mother=s
possession because he had been taking care of the children every day.  When Barker asked him why the children were
not placed with him, Father admitted that his apartment was not as clean as it
could have been.  Father was relatively
appropriate from January through March 2008, except for the agitation, the
pacing around, and the nervousness, which usually occurred when he spoke of
CPS. 

Father
appeared willing to learn the parenting materials and participated in the
parenting classes.  Father did quite well
on his final parenting quiz and completed all his parenting classes.  When Father had completed his parenting
classes, Barker talked with the CPS caseworker and discussed closing the VOA
services Aso that [Father] would not
become too dependent upon [their] transportation to and from the children=s
visits.@ 

N.     Children Returned to Father

1.     Mother=s
Testimony

Ms.
Cornelius, the CPS caseworker, told Mother that CPS was going to allow Father
to have the children back in his home because he had completed his services,
and the children went to his apartment from Jennifer W.=s
home.  Mother had some concerns about the
children being placed back with Father. She wondered whether he could take care
of the children financially and thought that she had Amentioned
to someone that is not a good idea,@ but she
did not remember whether she pressed it any further.  Mother admitted that she was instructed not
to have contact with Father until she completed her services. 








2.     Father=s
Testimony

Father
testified that the children were returned to him on June 10, 2008.  Father said that CPS did not have
reservations about him or they would not have returned the children to him.  While Father had the children, Mother was
allowed to see them only at the CPS office with supervision. 

Father
said that the children=s schedule when they were with
him included waking up around eight or nine; eating pancakes or biscuits for
breakfast; playing in the living room with toys; playing outside on the
playground; eating pizza, hamburgers, hot dogs, or bologna sandwiches for lunch;
playing and watching television; eating dinner that Father fixed;[19]
and giving them a bath before bed. 

Father
said that both children were in diapers. 
He had twice attempted to potty train A.B., but A.B. had issues with not
wanting to sit on the toilet.  Father
said that he wanted to slowly progress A.B. into potty training instead of
traumatizing him.  Father said that there
was no argument or forcing the issue. 








O.     Mother=s
Domestic Violence Incident

1.     Mother=s
Testimony

Mother
said that on June 16, 2008, she went over to Father=s
apartment because he had called her; she did not make a scene, she did not
punch Father in the face, and no citation was issued.  When Father=s
attorney produced a citation dated June 16, 2008 for assault by contact, Mother
said that was the first time that she had seen the citation and that she had
not been told that she had been issued a citation.  Mother said that she went to Father=s
apartment to see the children only once; she denied that there was an incident
in which she went to Father=s
apartment, she was unwilling to leave, and she was escorted to the door by
Father. 

2.     Father=s
Testimony








When
Mother came to Father=s apartment on June 16, 2008,
she knocked on the door and said that she wanted to see the children.  Father told her that he could not let her see
the children because Ms. Cornelius had said that Mother was required to have
supervised visits.  Father said that he
told Mother, AI=m going
to have to ask you to leave >cause I
don=t want
to lose [the children] again.@  Father had opened the door slightly, and
Mother pushed her way in and went to the bedroom where the children were
watching television. Father told Mother that she had to leave, put her arm
behind her back, and tried to escort her out of the apartment.  On the way out of the bedroom, Mother tried
to break out of Father=s arm and hit her eye on the
door frame;[20]
Mother left, went to the apartment manager, and said that Father had attempted
to beat her.  The police thereafter came
to Father=s apartment. 

Mother
came over Aone other time@[21] when
the children were with Father, and Father told her that she needed to
leave.  Mother punched Father in the eye
and then took off running down the stairs. 
Father said that this was the assault by contact episode that resulted
in a citation being issued to Mother. 

P.     Barker=s July 1
Visit to Father=s Apartment








On July
1, 2008, Barker reopened the file on Father because the VOA had received a new
referral that his children had been placed back in his care. Barker said that
she had concerns when she learned that the children had been returned to Father
because he was very agitated during many of her previous visits and spoke in a
very hostile manner about Mother and about CPS. 
Barker said that Father seemed to have a lot of anger issues, so she was
concerned with whether those had been addressed.  Barker felt like Father=s
agitation was Aprobably at a higher level@ than
what she considered to be normal for people in his situation. 

When
Barker went to Father=s apartment on July 1,[22]
she was concerned because Father had very little furniture and very little food.  He had a bed in his bedroom, a toddler bed in
the living room, a high chair, and an older television console.  Barker talked with Father about the fact that
he needed to get some food, told him about utilizing food banks, and said that
she would try to get a food card for him. 
The lack of food also concerned Barker because it was almost the Fourth
of July, and the stores would be closed for the holiday. During that visit,
Barker noted, however, that Father=s bed and
the toddler bed had sheets on them.

Q.     A.B.=s
Injuries

1.     Barker=s
Observation








On July
8, Barker went back to visit Father, brought food, and noticed that there was
not any new food.  Father and the
children appeared to have just awakened when she arrived around 9:00 or 9:30
a.m., and both children had dirty diapers.[23]  Barker pointed out the dirty diapers and told
Father to change them; he complied.  

Barker
noticed that A.B. had bruises on his face and ear.[24]  Barker asked A.B. what had happened, and he
said that he had fallen.[25]  When Barker asked how he fell, A.B. looked
down at the ground and did not say anything else. Before Barker could ask
Father what had happened, Father said, A[Y]ou
heard him, he said he fell.@  Barker asked Father how A.B. had fallen, and
he said that he had no idea how A.B. had received the bruising on his face and
ear and denied that he had struck the child. 
Barker told Father that he needed to call his CPS caseworker and inform
her of the fall.  Father seemed very
hesitant and told Barker that CPS was not going to believe him. 








Barker
found the bruising on A.B. to be Avery
upsetting.@ 
She stated that the children had just been placed back with Father, that
it was a very stressful time, and that now there was bruising on A.B.=s
face.  Barker said that it looked like a
definite handprint on A.B.=s cheek
and that his ear was very black and blue. 
Barker assumed that A.B.=s ear
had been pinched and said that the bruising on A.B.=s ear
was Adefinitely
not a sleeping print.@ 
If A.B. had fallen, Barker would have expected him to have had other
injuries, not just bruising on his face and ear.  Barker believed that the children were in a dangerous
environment, so she left to make a call to CPS to report the bruising on A.B.[26]  Barker called both the national CPS hotline
and the local CPS office because she thought the local caseworker could get out
to the apartment faster than someone from the national office. 








Barker
testified that Father called her a few times after the July 8 incident, and
Barker told him that she had made a referral to CPS.  Barker said that the calls that Father made
to her were appropriate for the most part; he wanted to verify that she had
relayed to CPS that A.B. had stated that he had fallen.  Barker said that Father continued to call her
after that, but she screened her calls and did not answer his calls.  When asked if Father continued to call and
harass her over the last year, Barker said, ANo.  He did come by the VOA office,@ but she
was not there.  Barker stated that after
Father came to the VOA office twice, they started keeping the doors locked
because his visits alarmed the ladies in the building. 

2.     Tammy Brooks=s
Testimony

Tammy
Brooks, who works for CPS, was assigned to investigate the referral that was
received on July 8, regarding physical injuries to A.B.  She and Officer Steven Osborne went to Father=s home
to make sure that the children were safe. 

Brooks
knocked on the door, and Father opened it. 
Father asked why she had come to his home Awith
those pigs,@ referring to the police.  Father called Brooks a Awhore@ even
though they had never met before.[27]  Brooks said that Father seemed annoyed that
they were at his home and wanted them to leave. 

Brooks
told Father that she needed to see the children because a referral had been
phoned in, but Father would not let her in. 
He asked if they had a warrant and said that they needed to leave his
property if they did not have one. 
Brooks explained that they did not need a warrant to see his children,
but Father still would not let her in. 








When
Brian Knox of FBSS arrived, Father let him inside his apartment. Knox came out
and reported the condition of the children to Brooks.  After that, Brooks told Father that she
needed to see the children and take pictures of them because Knox had reported
that they had injuries.  Father picked up
each child, held him/her out the door, and said, A[S]ee
they=re fine.@  Brooks told Father that if he did not allow
her to see his children so that she could make sure that they were safe, then
she would go to court, and there might be a removal. 

When
Father finally let Brooks inside the apartment, Brooks noted that the apartment
was sparsely furnished.  She saw a red
toddler bed in the bedroom, a mattress box spring on the floor, and dishes in
the sink; she did not recall seeing anything that was a danger to the children.  When asked whether the children were in a
neglected environment, Brooks said that she did not spend that much time in the
home and could not get a sense of it.[28]  Brooks also said that she could not tell
whether Father=s apartment was a dangerous
environment. 








Brooks
said that A.B. was wearing some mismatched shorts and a shirt; H.B. had on only
a diaper.  Brooks said that the whole
family had an odor from not bathing. 
Brooks noted that A.B.=s ear
was dark purple and that he had some linear bruises on his face.  Brooks said that A.B. was really dirty and
that she could not see any other bruises in the short amount of time that
Father allowed her in the apartment, but she did observe dark marks under A.B.=s eyes. 

Father
told Brooks that A.B. had fallen off the toddler bed.  Later, Father said that A.B. fell off Father=s
bed.  Then, Father gave a more detailed
version; he said that he had been asleep and had awakened when he heard A.B.=s
crying, and A.B. told him that he had fallen and that it hurt.  Father said that A.B. had marks on his eyes
because he was not getting enough sleep and that A.B. had marks on his cheeks
because he was rubbing his face on the carpet. 

Brooks
told Father that A.B. needed to be seen by a doctor to make sure that he did
not have additional injuries.  Father
refused to take A.B. to the hospital, stating that he was Anot going
to fall for it again@ because CPS had previously
taken his children from him at the hospital. 
Brooks told Father that if he would not take the children to the
hospital, CPS would remove them. 








Ultimately,
Knox transported the children to Cook Children=s
Hospital, and Brooks followed him. 
Brooks said that they had a problem when they first arrived at the
hospital and tried to get the children seen by a doctor; Father was very angry
and would not give any information to the hospital staff to allow them to
register the children.  Both children
were eventually seen in the emergency room. 


After
they had been at the hospital for an hour or more, Brooks took pictures of the
children and tried to clean H.B. with baby wipes because she had dirt on
her.  Brooks said that H.B. did not look
like she was failing to thrive[29]
but that both children stared and looked blank, so Brooks thought that they
might be hungry.  Brooks and Ms.
Cornelius bought food for the children and tried to blow on the food to cool
it, but A.B. kept putting it in his mouth and eating it while it was still
hot.  After the children were fed, they
began moving, talking to each other, and hugging each other.  








Brooks
tried to establish rapport with the children by asking their names and ages,
but A.B. was unresponsive.  When Brooks
pointed to his bruise and asked him what had happened, A.B. blurted out, AI fell,@ and A[i]t
hurt.@  After A.B. said that he had fallen, Brooks
heard A.B. tell Ms. Cornelius about a fight between Father and Mother.  A.B. moved his hand and body and said Father
pushed Mother, and he demonstrated how she fell down and how she was
pushed.  As he was telling the story,
A.B.=s voice
became loud, like he was acting out the scene that he had witnessed.

Based on
information that Brooks received from the emergency room doctor, who did not
believe that A.B.=s injuries were accidental,
Brooks decided to remove A.B. and H.B. from Father and to place them in foster
care.  In addition to her concern over
A.B.=s
injuries, Brooks said that the open FBSS case, the history,[30]
and Father=s behavior[31]
factored into her decision to remove the children. 








Corporal
Blanchard, who had arrived at the hospital while the group was in the exam room
waiting for the doctor to see A.B., escorted Father out of the hospital to try
to serve him with papers.  Ms. Cornelius
attempted to serve Father with the notice of emergency removal, but Father
refused to sign it.  He also refused to
sign a medical release information form and to provide placement information,
and he had an altercation with Corporal Blanchard.[32]
The doctor ultimately released the children to Brooks, and Ms. Cornelius placed
them in a foster home, where Jennifer H. became their foster mother. 








After
the removal, Brooks received phone calls and e-mails from Father.  Brooks said that somehow Father had obtained
her State e-mail address and had sent her multiple e-mails per day.  At the time of trial, which was almost a year
after the removal, Father had continued to e-mail her with the last e-mail
dated ten days before the termination trial commenced.  Brooks said that Father=s
e-mails[33]
repeatedly stated that Brooks had violated his rights, that she had taken his
children, that she had been wrong about his son, and that Father had not
injured his child.  Father did not ask
Brooks to further investigate the case but instead blamed her for taking his
children, saying that she had handled the case incorrectly.  Brooks said that Father kept repeating the
same information Ain massive amounts, massive
emails@ and
that he Awould
call back to back to back to back.  He
would just keep calling.@ 
Brooks did not respond to Father=s
e-mails because they were not providing new information; it was the same thing
that he had said on the phone, and she had already told him over the phone that
his case had Amoved on.@  Brooks described Father as Aunique@ because
he kept calling and e-mailing her, and she had never been contacted by a client
before via e-mail. 

3.     Nurse Wright=s
Testimony

Donna
Wright is a pediatric nurse practitioner and a sexual assault nurse examiner at
Cook Children=s Hospital.  She is also on the CARE Team, which is the
child advocacy resource and evaluation team that sees children who have been
possible victims of physical abuse, sexual abuse, or neglect.  She testified that she saw both A.B. and H.B.
on July 9, 2008, after they had been referred to the CARE Team.  

Nurse
Wright said that in the emergency room, A.B. underwent a CAT scan of his brain
to check for injuries and had x-rays taken of his entire body due to the
bruises that had been found.  All of the
tests came back within the normal range. 









Nurse
Wright performed a thorough head-to-toe assessment on A.B. because he was too
young to give her a history.  She saw
multiple soft tissue injuries on A.B. 
Specifically, she noted that A.B. had purple-red bruising approximately
two millimeters on his left eyelid and had petechiaCsmall
pinpoint-type bruisingCon his left cheek and also on
the temporal area right next to his eye. 
Nurse Wright said that A.B. had red lines of bruising on the left side
of his face and purple-red bruising on his left ear.  A.B. had a five-millimeter brown bruise on
his lower left abdomen, a five-millimeter brown bruise on his right lower
buttocks, and some line and configuration abrasions on his upper thigh.  Photographs of the bruises on A.B. were
admitted into evidence. 

Nurse
Wright provided her opinion regarding A.B.=s
injuries.  She testified that all of the
injuries to A.B.=s face were of equal severity
because of the amount of force that would have been necessary to cause those
injuries.  She said that the injuries
would have been painful to A.B. 








With
regard to the injuries to A.B.=s ear,
Nurse Wright said, A[T]hat is an injury where
something has to hit only the ear . . . . [S]omething struck the child in the
ear[,] or he only fell on one thing on his ear.@  Nurse Wright said that A.B.=s ear
injuries could have been from pinching, slapping, or twisting and
pinching.  She agreed that the injury to
the ear could have been caused by a parent=s
grabbing the child by the ear with the thumb inside the ear and the first
finger outside the ear and pulling or jerking. 
Nurse Wright testified that the injury to the ear would have required a
significant amount of force and agreed that whatever trauma caused the injury
to the outside of A.B.=s ear had sufficient force to
bruise through the ear to the back.  When
the trial court asked whether there would be enough strength in the fingertips
to make the bruise inside the ear while the rest of the hand was making the
print on the face, Nurse Wright answered that it would require really long
fingers to wrap that far around and that it would be difficult to have that
much force in the fingertips to cause bruising. 
The ear had a darker bruise, and Nurse Wright opined that the bruise on
the face and the bruise on the ear were approximately the same age based on
their color and the fact that they were in the same area of the body.  Nurse Wright opined that A.B.=s face
and ear injuries could have been caused at the same time, but the bruise near
his eye was caused at a different time. 
She said that all of the injuries to A.B.=s ear
and face had the potential to be severe because they were on his head and could
cause brain trauma.  








Nurse
Wright testified that she believed that the injuries on the left side of A.B.=s face,[34]
which included the linear configuration, were slap marks.  She opined that the slap print was caused by
an adult because the length between each of the linear marks was inconsistent
with a child=s hand, that the person who had
slapped A.B. had used his/her right hand, and that the bruise from the alleged
hand slap was approximately less than three or four days old.  Nurse Wright agreed that there was one slap
to A.B.=s face
and that was all they had pinned down and that the injury could not have been
caused by a carpet burn because there were no abrasions, just bruises.

With
regard to the injuries to A.B.=s eye,
Nurse Wright said that if someone fell forward on an object or onto the floor,
his cheeks or forehead would be injured, not the inside of his eye.  To cause injuries inside the eye, a toy or
another object would have to go straight into the eye.  Nurse Wright did not know what caused the
injury to A.B.=s eye socket.  She said that there was a possibility that
the thumb from the hand that made the slap mark might have reached A.B.=s eye
socket, but it was on a different plane. 
Nurse Wright did not dispute that A.B. could have fallen, but she did
not believe that A.B.=s injuries occurred from a
single fall because the injuries were on two different planes of the head. 








She said
that the bruise on A.B.=s buttock was of concern because
it was in an area protected by a diaper and was a different color than his
other bruises, which indicated that it had occurred at a different time than
the other bruises.  Nurse Wright said
that it would take a lot of force to get a bruise in a spot covered by a
diaper, but A.B. could have sustained a bruise on his bottom if he was running
around without a diaper on.  Nurse Wright
could not say that the bruises on A.B.=s
abdomen and buttocks happened at the same time; she could only say that they
were about the same age and were older than the bruises on A.B.=s face.

Nurse
Wright was Aextremely concerned@ about
the bruise on A.B.=s abdomen because it is very
difficult for the abdomen to bruise from a fall.  She said that there is always a concern about
internal injuriesCto the liver and pancreasCwhen
there is a bruise on the abdomen. 








Nurse
Wright said that common accidental bruises in children usually occur on the
front side of their bodies on boney prominencesCtheir
knees, hands, or foreheadCwhen they fall.  However, A.B. did not have bruises on his
boney prominences when Nurse Wright saw him in July 2008.  The fact that A.B. did not have any bruises
on his boney prominences was a red flag, but it was the compilation of where
all the bruises were located that resulted in Nurse Wright=s
diagnosis of Anot an accident.@  Nurse Wright said that if A.B. had told her
that he had fallen, that would not have changed the diagnosis that he had
non-accidental injuries because all of his injuries were not from a single
fall.  If A.B. had fallen from a toddler
bed, Nurse Wright said that it would have been more likely that he would have
had injuries to a boney prominence in addition to the injuries that he had
presented with.  Nurse Wright said that
in her opinion, the linear marks were probably from a slap and that the ear
injuries could have been caused by a fall. 
Nurse Wright said that it would not be inconsistent for A.B. to have
said that he had fallen, had hurt his ear, and was slapped; however, she did
not think that scenario would explain all the injuries that he had.  Nurse Wright said that the probability of
A.B.=s
injuries being caused by an accident was less than five percent. 

Nurse
Wright performed the same head-to-toe examination on H.B.  H.B. had a pale brown bruise on her left
thigh that was approximately three by four centimeters.  This bruise was not of concern because there
were no other bruises and no other injuries. 








Nurse
Wright saw in the hospital records that H.B. had been hospitalized nine months
before for failure to thrive.  Nurse
Wright was extremely surprised that H.B. had been previously diagnosed as Afailure
to thrive@ because Ashe was
so chunky, she was playful, active@ and
because she was in the seventy-fifth percentile for weight, the tenth
percentile for length, and the fiftieth percentile for head circumference.  Nurse Wright said that if she had been in
private practice and had seen a child who had gone from the twenty-fifth
percentile to the tenth percentile within about four or five months, she would
have been extremely concerned and would have required the family to come back
to the office to have the child=s length
and weight checked periodically to monitor the situation.  If the child had come in to a clinic with
those falling stats, Nurse Wright said that she would have a significant
follow-up appointment and would want to see all past growth to know whether the
decrease had occurred gradually or had immediately dropped off.  Nurse Wright said that it would be difficult
for a child=s care giver to know that the
child was falling off the growth chart unless he or she had gone for a visit
with the child=s pediatrician and had been told
of the problem.

4.     Caseworker=s
Testimony

Father
volunteered to Ruth Groomer, who became the family=s
caseworker in July 2008, an explanation about the cause of A.B.=s
bruising:  he said that A.B. had fallen.  Father told Groomer that he and the children
had been walking down the street and that A.B. had fallen on a gate rail.[35]  Father told Groomer that he never slapped
A.B. 

5.     Father=s
Testimony

Father
testified that on July 7 at about 7:00 p.m., A.B. was walking next to the
stroller that H.B. was sitting in when he tripped and fell over a gate at the
apartment complex and hit his ear and his cheek on the ground.  Father said that there was no swelling when
he checked A.B. before they went to bed. 








They
went to sleep about 8:00 or 9:00 p.m., and Father awoke an hour or two later to
A.B.=s
crying, AMy
ear.  My ear,@ and he
was slapping his hand against the metal headboard of his bed.  When Father asked A.B. what had happened, he
said, AMy
ear.  My ear.  My ear.@  Father thought that A.B. had been jumping on
the bed and had fallen down and had hit his ear on the headboard because he was
standing on the carpet slapping the headboard when Father woke up.  Father did not see any bruising on A.B. at
that time.  Father said that it is
possible that A.B. sustained his injuries from both the fall over the gate and
the incident with the headboard.  Father
said that he was concerned about A.B.=s injury
but that he knew that it was not life-threatening. 

Father
testified that he and the children were sleeping when Barker arrived the next
morning.  Barker thought there was dirt
on A.B.=s ear
and tried to rub it off; she then pointed out the bruising on A.B.=s ear
while Father was changing his diaper. 
Barker asked A.B. what had happened, and he said that he had fallen.[36]  Barker did not press A.B. for further
details.  








Father
said that he told Barker the whole story about A.B.=s
slapping the headboard with his hand but that she must have left that out of
her testimony. Father believed that there was an injury to only one side of
A.B.=s ear
and that Barker=s rubbing A.B.=s ear
may have caused bruising to the other side of his ear to show up at the
hospital.  Father said that he never
slapped A.B. and never pulled or tugged on his ear. 

Around
3:00 p.m. on the same day that Barker had visited Father, Brooks came to Father=s
apartment, along with the police and others. 
The children were in the living room, and Brooks was outside the door
when Father called her a Awhore.@  Father said that he was very sorry for his
actions.  Father described his attitude
when the police arrived as Aiffy.@  He said that he was not cursing at, screaming
at, hollering at, threatening, or assaulting anyone; he was just trying to get
his point across that A.B. did not need to go to the hospital because he had
simply fallen.  Father said that he did
not have anything to hide but was scared that CPS was not going to believe
anything that he said about where the injury came from.  He said that he had finally gotten his
children back and felt like his life was where it needed to be, so he was
afraid of losing his children again. 

Father
said that he went to Cook Children=s
Hospital when Brooks threatened to remove the children if he did not take A.B.
to the hospital to be examined.  He
explained that when he refused to sign forms at the hospital, he did so because
he thought that CPS should pay for the visit because they had requested it. 








6.     Mother=s
Testimony

A.B.
told Mother numerous times, A[D]addy
tried to break my ear.@[37]  Mother said that A.B. did not provide
additional details after he said that Father had tried to break his ear, but he
was persistent in his story.  Mother
believed A.B. and said that Father engaged in similar behavior with her, but
Mother later said that in all her years with Father, A.B.=s
statement regarding his ear was the only incident that she is aware of in which
her son complained that Father may have injured him. 

R.     Father Charged with Injury to a Child

Father
talked to a detective on July 9, was charged with injury to a child, and spent
seventy-five days in jail from July 16 to September 29, 2008.  Father=s bond
was initially set at $10,000.  Father
asked for a personal recognizance bond, and Athe
judge, I guess, got mad, and he doubled my bond at arraignment from 10 grand to
20 grand and was making it impossible for me to bond out.@ 








Father=s
understanding was that if he did not plead guilty, he would spend two years in
jail pending trial.  So Father signed a
judicial confession that he had injured A.B. and entered a guilty plea because
he missed his children and knew that the only way he would have any hope of
getting his children back would be to plead guilty and to start working on his
service plan. 

S.     Father=s Second
Round of Services[38]

1.     Service Plan Requirements








As noted
above, Groomer became the caseworker on this case in July 2008 while Father was
incarcerated in the Tarrant County Jail.  Groomer developed a service plan for Father
that required him to attend counseling, parenting classes, anger management
classes, and a batterers intervention program.[39]  Father=s
service plan also required him to undergo a psychiatric evaluation, a
psychological consultation by Dr. Parnell Ryan,[40]
and a drug and alcohol assessment.[41]


After
Groomer developed a service plan for Father, she went to visit him at the jail
on August 26, 2008; gave him the service plan; and went over it with him.  During that meeting, Father called Groomer a Abitch@ and
told her that he had already done services with FBSS, that he would not participate
in services, that he did not need services, that the charges against him were
going to be dropped,[42]
that he would be getting his children back, and that he would move to Missouri
to live with his mother as soon as his children were returned to him.  Father said that he would not sign the
service plan until he had talked to his attorney. 

 

 








2.     Service Plan Delay

a.      Groomer=s
Testimony

The
trial court held a status hearing on September 30, 2008, at which Groomer
reported that Father had been released from jail the previous day but was not
in attendance at the hearing and had not contacted Groomer despite the fact
that her phone number was on his service plan. 
Groomer acknowledged that Father had lost two and half months of time on
his service plan while he was in jail.[43]


In
November, Father said that he had lost his service plan.  Groomer said that she provided Father with
several copies of his service plan; she mailed two copies to him and
hand-delivered one in December when she went over the services with him
again.  Father continued stating through
December 2008 that he would not work his services. 

b.     Father=s
Testimony








Father
said that Groomer=s statement that he did not
contact her until December was incorrect; Father said that within a week of
being released from jail, he had contacted Groomer about getting his services
in place.  Father testified that he had
called Groomer fifteen to twenty times in October 2008 and had left voice mails
but received no response.  At a hearing
in January 2009, Father=s attorney demanded that Father=s
services be initiated and pushed, and CPS moved a little faster after that
hearing by scheduling parenting classes and anger management classes. 

3.     Parenting Classes

Father
said that as part of his parenting classes, he learned about nutrition;
discipline; holding, comforting, and cuddling the children; playing with the
children; showing the children that he cared; watching television with the
children; the timing for feeding and bathing children; and dealing with the
stress of being a parent.  Father said
that the parenting classes taught him not to spank his children but to put them
in the corner and talk to them to see if they knew why they were in the corner;
once they said that they were sorry for what they had done wrong, Father could
let them out of the corner. 

Father
admitted that he initially did not want to take the parenting classes, but he
later realized that they were beneficial and said that they helped him a
lot.  He said that the parenting
instructor listened to the parents, gave them a chance to talk, and Awas just
all around a great lady.@ 
He did not have any personality conflicts with her.  Father made a good grade on his test and
received a certificate of completion.

 








4.     Anger Management and Individual Counseling
Classes

a.      Burdick=s
Testimony

Constance
Burdick, a clinical social worker with Catholic Charities Diocese of Fort
Worth, testified that Father came to her for anger management classes and
individual therapy.  Father was punctual
to all ten anger management sessions.  In
the first class, Father blurted out, AAre you
qualified to write a letter saying I don=t have
an anger problem and get me out of this class?@  Father said that he did not want to be there,
that he did not have an anger problem, and that he wanted out of the
class.  Father thereafter frequently
asked Burdick to write letters saying that he did not have an anger
problem.  During the classes, Father
talked about what had happened with A.B., and Burdick told him that he needed
to wait until individual counseling to discuss that topic.  Father also announced in the anger management
class that he had ADHD and bipolar disorder.[44]  However, Father was never asked to leave a
class, and his behavior in the class was not so inappropriate that he was
unable to complete the class.  








Burdick
stated that Father has impulse control issuesCwhen he
wants to talk about something, he does not stop talking about it and will
interrupt others when they are talking. 
Burdick believed that Father needed to be in the anger management
classes because he was agitated and intrusive, interrupting other people.  Father=s affect
was angry, and he was very tense.  Father=s anger
stemmed from his feeling that the police, the physician at Cook Children=s
Hospital, CPS, and the courts all had a vendetta against him.  In Burdick=s
opinion, Father did not have any behavioral changes and was not able to
articulate what he had learned in the anger management class.








When
Burdick conducted individual counseling with Father, she did not see him use
the skills that he had learned in the anger management class.  He was angry during most of the individual
counseling sessions; he was loud, was focused on what he wanted to talk about
(i.e., about what had happened to A.B.),[45]
and would not accept redirection.  Father
was not cooperative during the individual counseling sessions; his total focus
was on getting Burdick to write letters stating that he did not have an anger
problem, that he did not harm his child, that he did not need to be in
counseling, and that his children should be returned to him.  When Burdick told Father that she could not
write a letter about an event that she did not witness, Father became agitated
and said that he was going to prove that he did not hurt A.B.  Burdick took Father at his word that he had
not hit A.B. 

Father
told Burdick that he and Mother did not get along and that there had been
domestic violence between them.[46]  He described one incident that occurred when
he twisted Mother=s arm behind her back, and the
other happened when Mother injured Father on June 16, 2008.[47]  The children were with them when this
incident of domestic violence occurred. 
Father repeatedly asked Burdick to obtain the police reports from the
domestic violence incidents, but she did not. 
Burdick believed that Father should have called 911 instead of trying to
remove Mother from the premises.  Burdick
said that Father never acknowledged that he was an abuser of Mother or A.B. 








Father
told Burdick that he was actively involved in all the CPS programs and that he
was doing everything that CPS wanted him to do, including getting on
medication.  Burdick, however, could not
say whether Father was taking his medication, only that he repeatedly told her
that he wanted to get off his medication. 
Burdick recommended that Father have a full battery of psychological
testing to rule out schizoaffective disorder, but he said that he would not
undergo further testing. 

Burdick
believed that Father=s involvement with CPS when he
was a child had a bearing on his current frustrations with CPS in trying to get
his children back.  Burdick agreed that
Father was driven to get his children back and said that was not a vice.  Burdick felt that Father had anger control
problems based on the behavior he exhibited and felt that he had been involved
in domestic violence.  

Father
complained to Catholic Charities that he and Burdick were not able to work
together, and ultimately, Burdick was removed from the case. 

b.     Father=s
Testimony








Father
said that he initially did not think that he needed the anger management class
but that he did learn a lot, such as how to control his temper, how to deal
well with others, how to communicate positively, and how to not get aggressive
with other people.  When Father was asked
to explain why he still had a tendency to be confrontational after taking the
anger management class, he said, A[T]hey=re
making me look out to be a little bit more worse than it actually is.@  He said that he gets agitated every now and
then because he is doing everything he can to show CPS that he deserves to have
his children returned to him, but CPS is not willing to give him a chance.  Father complained about CPS=s
failure to return his phone calls and their unwillingness to sit down and have
a discussion with him.  He said that he
became agitated when he was told that the plan was family reunification and
then it was changed to termination. 

Father
said that he got along with Burdick for the most part.  He said that there were no major
confrontations, just Aa little discussion at the
beginning.@ Father ultimately earned a
certificate for completing the anger management class. 

However,
Father began having problems with Burdick in the individual counseling
sessions.  In counseling, Father was
confronted about his alleged abuse of A.B., and there was a presumption that he
had done Athese things.@ Father
believed that Burdick had already decided that he was a child abuser and a
batterer, and he felt like that put up a wall between them and did not give him
a chance to bond with the counselor.[48]  So Father asked CPS for another counselor,
and they said he had to remain with Burdick. 
Ultimately, Ms. Hart with Catholic Charities allowed him to switch.

 








5.     Drug Testing

Father
said that he has never touched drugs and has never had a positive drug
test.  He explained that one time he
walked past some neighbors who were smoking marijuana and that someone told the
apartment manager that he was smoking marijuana; the apartment manager then
called Ms. Cornelius, who sent Father to take a drug test.  Father passed the drug test and said that was
the only allegation of drug use. 

6.     Visitations

a.      Groomer=s
Testimony

Father=s first
visitation with the children after he was released from jail occurred on
October 10, 2008.  Typically during the
visits, Father picked up the children individually and gave them a very short
ride on his shouldersCmaybe one trip around the room
for each childCand then he sat down because he
said that he was tired.  Father then read
a book aloud, but he did not gather his children to him.  The foster mom sent lunch for the children,
and Father brought them a snack because he did Anot
always have the money to provide [every]thing for his children.@  Groomer said that the visits Awent
okay.@ 








Val
Trammel was the case aid who observed most of Father=s
visits, and Groomer observed all but approximately five.  Groomer said that it was extremely rare to
have two people observe a parent=s visits
and agreed that supervised visitation is not the optimum type of visitation,
but the judge had ordered two people to observe Father=s
visits.  Additionally, the visits were
ordered to take place at the Ben Street location so that there would be a
security guard.  Groomer believed that
condition was Aabsolutely appropriate@ because
several times they had needed the guard to intervene.  








For
instance, in April, Father came to a visit while he was very agitated, walked
straight toward Groomer, started ranting and raving and shaking his finger in
her face, waved his arms, and screamed at her. 
Father said that Groomer and the program director had lied to him about
CPS=s plan
for reunification.[49]  Groomer said that Father stood over her
screaming, would not sit down, and would not calm himself even after she and
the security guard had requested that he calm down.  The children retreated to a corner because
they appeared to be afraid of him. 
Groomer became fearful for the children to be returned to Father and
decided that CPS should terminate Father=s
parental rights.  Groomer canceled Father=s
visitation for that day, and CPS did not give a make-up visit.  Groomer testified that in her seven and a
half years with CPS, she had never seen anyone as upset as Father was.  He was so upset that it made her fearful or
anxious. 

Groomer
testified that the photos that were introduced at trial of Father cuddling with
the children at the visits were posed at Father=s
request.  Groomer said that Father
prompted the children to smile at him and then took their picture during the
visitation.  Groomer could not say that
all the Ahappy
pictures@ were
prompted because the children had a wonderful time when they were playing on
little cars, but Groomer said that they were not interacting with their Father
when they were playing on the little cars. 

b.     Father=s
Testimony








Father
said that he usually arrived about a half hour early for his visits and that
the children would run up to him and grab his leg and hug him.  Father said that he would read to them, play
with toys with them, and toss papers like Frisbees to them.  Father said that his children hugged and
kissed him and would ride on his shoulders. 
Father said that he changed diapers and fed his children at every visit,
though sometimes he fed them food that the foster parents had packed because he
is on food stamps.  Father said that he
did whatever he could to show his children that he loved them and that he
wanted them back, including telling them that he was trying his hardest to get
them back. 

Father
asked Groomer if he would be allowed to take the children out to the playground
during his visits instead of having them stay in the office.  Father asked Groomer throughout the majority
of the visits and finally had to go to Groomer=s
supervisor to get the approval to take his children to the playground.  Father was able to take the children outside
two or three times until A.B. was bitten by a bug at the foster home, and then
CPS refused to allow Father to take the children outside. 

Father
said that Groomer=s description that the children
were lifeless and flat during his visits was Anot true
at all.@  Father said that the pictures showing his
children with smiles on their faces accurately depicted their demeanor during
his visits.  Father said that his visits
went very well and that his children cried and wanted to go home with him.  








Father
said that the visits when Trammel supervised solo went much better than those when
Groomer was also present because Trammel quietly observed.  Father said that Groomer wrote on a notepad
continuously during the visits that she supervised and would verbalize things
during the visit, such as, A[H]e=s not
kissing them enough.@ 
Father had a problem with Groomer=s
standing over him during his visits, making him feel like he was a criminal and
a bad father.  Father said that if there
was verbal friction between he and Groomer it was started by her and would only
last a few seconds because he would Achill
out >cause [he]
didn=t want
[his] kids to see that.@ 
Father testified that he attempted but was not successful in
establishing a working relationship with Groomer. 

7.     Home Visits

Groomer
said that before attempting a home visit on Friday, March 20, 2009, at 4:00
p.m., she called Father=s attorney because she wanted to
request permission to go into Father=s home
to see if he had adequate accommodations for his children.  Groomer denied wanting to get incriminating
information on Father and said that she did not have a camera with her. 








When
Groomer went to Father=s home to perform the
unannounced home visit to check on his environment, she took two caseworkers
along with her.  Groomer knocked on the
door, and Father opened the door a small crack and said that he would have to
call his attorney.  Father was very angry
when he opened the door, and his hands were shaking extremely hard.  After Father spoke with his attorney, Father
said that his attorney had refused to let them come in, and so Father did not
let Groomer in that day.  While the door
was cracked, Groomer noted an extremely heavy smell of smoke and a kind of a
musky smell; she said that Father smokes Asome
kind of a little cigar.@ 

8.     Service Plan Compliance

a.      Groomer=s
Testimony








Groomer
said that Father=s services were set up
immediately on January 6, 2009, when he agreed to do his services.  Father completed the parenting classes and
received a certificate, underwent a psychological consultation as ordered by
the trial court, took part in an anger management program and received a
certificate, attended counseling, made every visitation with his children, and
maintained the same residence throughout the pendency of the case.  Although Groomer had no indication that
Father had drug or alcohol issues, she included a drug and alcohol assessment
in his plan.  Father did not participate
in the drug and alcohol assessment. 
Father also did not go for a psychiatric evaluation, even though Groomer
had given Father the number for MHMR so that he could undergo the evaluation at
no charge.  At the time of trial, Groomer
had not received any information stating that Father had completed a batterers
intervention class, but during the weeks prior to trial, Father told Groomer
that he was attending a batterers intervention class or was going to
attend.  When asked whether she wanted to
leave the trial court with the impression that Father was not active in getting
all of his services taken care of, Groomer said that it was not an impression;
it was a fact.  Groomer later agreed that
Father took all the services that were offered, but in this case, it was not
enough.  Groomer did not see any
behavioral changes or improvement in Father=s Acharacter@ after
the completion of the programs, and Groomer did not believe that Father had
demonstrated any benefit from the services that CPS provided to him.  In Groomer=s
opinion, Father did not make a positive change within a reasonable time period,
and he did not have adequate parenting skills to care for his two young children.


b.     Father=s
Testimony

Father
testified that he had completed the parenting class, the psychological consult,
the anger management class, the counseling sessions, and had made all his
visits except for when he was in jail. 

T.     Father=s
Probation

1.     Oldham=s
Testimony

Samuel
Oldham, Father=s probation officer, testified
that he was assigned to work on cases for people with mental illnesses.  He met with Father on December 31, 2008, and
noted that Father had previously been diagnosed as bipolar and that his
diagnosis had been sustained by two separate psychological evaluations
performed by Dr. Parnell Ryan. 













Father,
who was serving a two-year probation, was required to perform 160 hours of
community service,[50]
to report to his probation officer at least once a month or as directed by the
trial court or by Oldham, and to pay a $25 monthly probation fee.  Oldham testified that Father=s
probation had five additional mental health conditions: (1) submit to a
psychiatric and/or a psychological evaluation, which Father did; (2) attend and
participate fully in counseling or classes as directed by the trial court or
Oldham, including Project Safe Neighborhood, which he completed, and a
substance abuse evaluation; (3) take all medication as prescribed by the
treatment provider;[51]
(4) abstain from the use, possession, or consumption of alcoholic beverages and
submit to testing for alcohol use, which Father complied with by submitting to
four urinalyses that were all negative; and (5) be assigned to a mental health
officer, which was completed.  There was
a supplemental condition that there be no harmful/injurious contact with
children and that he have only adult-supervised contact with children.[52]


Early on
during Father=s probation, he violated the
terms by failing to submit to a substance abuse assessment, but that violation
was later cleared up as a misunderstanding based on scheduling.  Father violated his probation on April 3, 2009,
when he failed to report for his scheduled monthly appointment.  Father claimed that his appointment was at a
different time, but Oldham said that Father had been issued written
instructions that contained the correct time. 
Father was contacted on April 4, and he reported as scheduled later in
the month.  








On May
6, Father received a citation for failing to take his medication as
prescribed.  During a home visit, Oldham
saw that Father had not been taking his medicine, and Father explained that he
had been taking his medicine every other day because he did not like the side
effects.[53]  Father admitted that he did not consult with
a physician prior to altering his medication schedule and has since reported
taking his medicine as prescribed. 
Oldham, however, admitted that the probation department does not have
the resources to test whether Father is taking the medicine or throwing away
the pills.  After the May 6 citation was
issued, Oldham noticed mood swings in Father. 
On May 21, Father called and spoke to acting supervisor Kelly Pierce and
expressed various frustrations to her; he sounded very agitated and angry.  Five days later when Father called and asked
what would happen to his community service once his CPS case was taken care of,
Oldham thought that Father sounded depressed because he was brief in his
answers and used a subdued voice.








Oldham
made four unannounced visits to Father=s
home.  On the two visits when he went
inside,[54]
on February 25 and May 6, 2009, Father=s
apartment was very messy and cluttered. 
Oldham noted that Father=s
apartment smelled very strongly of tobacco smoke, that there were a large
number of dirty dishes in the kitchen, that the refrigerator did not have much
food in it, that the child=s bed
and the baby bed both appeared to be in very poor repair, that the baby bed did
not have a padded bottom so the metal support bar was clearly visible as a hump
in the bottom lining, that the bedroom was very messy with clothes on the
floor, that the bed did not have a frame and did not have sheets on it, and
that a gate was stretched across the entry to the kitchen.  Oldham stated that he found Father=s
apartment in a similar condition the second time that he went in.  In his lay opinion, Oldham said that the home
environment was not suitable for small children. 

Oldham
said that Father Aacts as someone who does not
want to be on probation, and he works very hard at taking care of his case@ and can
be described as Avery proactive.@  Oldham said that there was a fifty-page
printout of all his contacts with Father, and Oldham guessed that approximately
seventy-five percent of the contacts were phone calls in which Father had asked
about his community service and about whether Oldham had received any
communication from CPS.  Father talked at
length to Oldham about his CPS case, including his fears and his poor
relationship with the CPS workers. 








Oldham
testified that Groomer had contacted him approximately three times a
month.  The initial contact was made by
telephone, but subsequent contacts were required to be made in writing so that
the trial court could approve or disapprove of her requests for information.  On March 10, 2009, Groomer requested
information concerning the condition of Father=s home
during home visits, Father=s
attitude and behavior during the home visits, any children observed in the
home, the results of the psychiatric evaluation, any medications prescribed to
Father, anyone who had been fearful of Father, and Father=s
feelings about CPS staff.  On March 25,
2009, Father signed a release, giving Groomer access to information held by
Oldham.  Oldham believed that Groomer=s
questions were appropriate for her safety and the safety of others. 

On April
9, Groomer called to inform Oldham that a CPS director had sent Father an
e-mail telling him that he was to cease calling a doctor who had examined his
child earlier in the month for a diaper rash. 
Groomer said that Father repeatedly called the doctor=s office
and that the doctor=s personnel felt
threatened.  Groomer said that the doctor
had called the police and reported to her that Father would be arrested for
trespassing if he came to the doctor=s
office.  Father sent an e-mail to Groomer=s
supervisor stating, AI=m sorry
that you=ve been
misinformed regarding calls to the doctor=s
office.  I have not called their office
at any time.@ 
Oldham was not able to verify Groomer=s
concerns.  

On May
6, Groomer e-mailed Oldham with news that Father had been confronted over
identity theft but that the charge could not be prosecuted because of the
manner in which the victim of the identity theft handled the situation.  








On May
20, there were e-mails and letters received by Oldham from CPS alleging that
Father had contacted the children=s foster
parents.  

Oldham
said that if Father finished all of his community servics, maintained his fee
payments, and maintained general compliance with his probation conditions, he
would be eligible for mandatory early dismissal review in September 2009.[55]  If Father finished his community service
before then, he could obtain an early hearing through an attorney. 

Oldham
expressed some concerns about Father=s mental
stability if he did not become more proactive with his psychiatric
treatment.  Oldham specifically noticed
high levels of aggression during Father=s phone
calls and office visits; most of his aggression was directed toward agencies,
but some was directed toward individuals. 
Father never threatened Oldham, but Father had become agitated with
Oldham and had accused him of unethical behavior.  Based on Oldham=s
training, experience, and interaction with Father, Oldham believed that Father
could be a physical danger to others. 

2.     Groomer=s
Testimony








While
this case was pending, Groomer asked the trial court for permission to have
Father sign a release so that she could talk to his probation officer.  Groomer called Father=s
probation officer five times to find out about drug tests and whether Father
was in compliance with his probation terms. 
Groomer read on the record the unredacted portions of Respondent=s
Exhibit 13, an e-mail from her to Oldham, in which she had requested
information on Father. 

Groomer
admitted that she had provided information to Oldham, telling him that Father
had a girlfriend in Springtown and that he was traveling out of the county to
visit her.  Groomer agreed that she did
not have personal knowledge of any of these purported facts.  Groomer also contacted Oldham to tell him
that Father had improperly e-mailed the foster parents.  Groomer admitted that she had also called
Oldham to talk about Father=s
claiming his children on his income tax return and to inform Oldham that she
had been told that Father was involved in some kind of fraud.  When asked how many times she had called
Oldham in an effort to provide information on Father that would result in the
revocation of his probation and that would Acause
him to go to jail for ten years,@ Groomer
said that she never knew that it could cause Father to go to jail for ten
years. 

U.     Children=s Lives
with Foster Parents

1.     The Initial Foster Parents








Jennifer
H. testified that A.B. and H.B. were brought to her by CPS near midnight on
July 8, 2008, and remained in her home until February 15, 2009.  When the children arrived, they had on
pajamas, their hair was matted and had not been washed, they were dirty and
very much in need of a bath, their fingernails were long and dirty, and they
had no additional clothes; it took two baths the next morning to get them
clean.  While Jennifer H. was bathing
A.B., he told her that Ahis daddy tried to rip his ear
off,@ and
Jennifer H. noted that the inside of A.B.=s ear
was black and blue, he had finger-sized bruises on both sides of his cheeks,
and one of his eyes was bruised. 
Jennifer H. said that A.B. spoke to her very clearly[56]
and that she reported his statement to CPS. 

Jennifer
H. said that H.B.=s language was inappropriate for
a two-year-old child.  She would yell at
Jennifer H., A[W]ould somebody go get me a
damn bottle,@ and if someone bumped her, she
would say, A[G]--damn you.@  Jennifer H. said that they told H.B. that her
language was inappropriate, and she gradually stopped using profanity. 








Jennifer
H. observed that the children were very fearful of not being fed, and H.B.
grossly overate when she first arrived in their house, while A.B. would hide
food and stand in the corner and eat. 
Additionally, Jennifer H. recollected an incident involving H.B.
and International House of Pancakes (IHOP). 
Around Thanksgiving, the children saw a commercial for pancakes at IHOP,
and Jennifer H. told the children that she would take them there.  When they arrived at the restaurant, it was
packed, so Jennifer H.=s husband made the decision that
they would go to another IHOP location. 
A.B. became hysterical, and Jennifer H. had to physically put him in his
car seat.  A.B. tried to open the window
and get out and was crying uncontrollably. 
Jennifer H. kept reassuring A.B. that they were just going to another
IHOP.  When they pulled into the second
IHOP, Jennifer H.=s husband assured A.B. that he
was going to be able to eat pancakes, and he Akind of
calmed down and . . . went in and . . . ate.@ A.B.
ate all of his food and all of Jennifer H.=s food
and was very embarrassed by the way he had acted. 








Before
the children=s visits with Father started,[57]
Jennifer H. said that the children Awere
great.  They were happy.  They played with the other children.  They were kids.  You know, they ate well; they loved to go
shopping; they loved to look good.  You
know, we -- -- bought them a lot of nice clothes.  And they were -- they were just happy.@  Jennifer H. said that the children were very
comfortable in her home, they slept through the night in twin beds, and they
used sippy cups.  

After
the visits with Father started, Jennifer H. noticed Aa real
rapid decline in their behavior.@  Jennifer H. said that the children would come
home from the visits Awired,@ and at
other times, they wanted to sleep in the crib or play pen.  For instance, after some visits, A.B.
went  immediately to the play pen or the
crib or grabbed a bottle and asked Jennifer H. to fill it up and then asked to
be put in the crib.  A.B. laid in the
crib and watched SpongeBob on the television for as long as she would
let him.  Jennifer H. said that A.B. did
not act like that on other days of the week. 

A.B.
also experienced nightmares and would cry out, A[N]o,
daddy, no.@ Jennifer H. would go in to his
room, wake him up, hold him, calm him down, and put him back to bed.  A.B.=s
nightmares happened on the night of the visit and sometimes the night after the
visit and continued for several months. 
A couple of times during his nightmares, A.B. fell out of his bed until
Jennifer H. remedied that by placing body pillows around his bed.  








After
A.B.=s
initial telling of the story about his ear during his first bath at Jennifer H.=s house,
every so often, A.B. would repeat his statement.  One morning when Jennifer H. and A.B. were
waiting for the school bus, A.B. started to cry and said that his ear
hurt.  When Jennifer H. asked if A.B. had
fallen or if he had bumped it, A.B. said that his dad had tried to rip it off. 

Jennifer
H. said that around that time, she and her husband made the decision to Alet go@ of A.B.
and H.B.  Jennifer H. had initially
wanted to adopt A.B. and H.B., but Father had started making accusations
against her.[58]  Jennifer H. said that her home was
investigated three times for sexual abuse and physical abuse.  The first allegation that Father made was in
regard to bad diaper rashes on H.B. 
During that time, H.B. had the flu and was having a lot of bowel
movements, so the diaper rash was hard to control.  The second allegation was that something may
have happened sexually to the children. When Father attempted to change A.B.=s diaper[59]
at a visit and he resisted, Father made the accusation that A.B.=s
reaction proved that Jennifer H. was molesting him.  A CPS caseworker examined A.B. and determined
that he was fine.  The third allegation
involved a bite.  H.B. was bitten by
Jennifer H.=s daughter while H.B. was in her
home.  Father wanted a doctor to look at
the bite marks on H.B.=s face, but Groomer told
Jennifer H. that was not necessary. 
Thus, CPS ruled out all of the allegations.








2.     Father=s
Allegations Against Jennifer H.

Father
testified at trial regarding his version of the allegations that he made
against Jennifer H.  He said that the
first referral was for an allegation of sexual abuse based on a visit when he
went to change A.B.=s diaper, and A.B. pushed him
away; Father said that A.B. had never done that before, and it alarmed
Father.  Father asked Groomer to look
into the sexual abuse allegations. 

The next
referral involved a purple, golf-ball sized bruise on H.B.=s face
below her left eye.  Father asked Groomer
to have a physician look at it, and Groomer said that she believed the foster
parents= storyCthat
their daughter had bitten H.B.Cand that
there was no need to have a physician look at it. 

The
third referral was for redness in A.B.=s
private area.  Father said that he felt
like the referrals that he made were made in confidence under state law. 

3.     The Current Foster Parents

Greg,
A.B. and H.B.=s current foster parent, testified
at trial that the children had been in his home for approximately four
months.  During the first couple of days
that A.B. was in their home, he made the statement, ADaddy
tried to break my ear,@ and another statement, ADaddy
tried to pull my ear off.@








Greg
said that A.B. would Ahit a wall emotionally,
physically@ about mid-afternoon and would
become very easily agitated at the smallest thing and would throw a
tantrum.  Greg said that A.B. would
regress and that the episodes would usually involve self-injury or an injury to
his wife Julie.  A.B. struck Julie, H.B.,
and Greg, with the last time that he hit Julie occurring in April 2009.  A.B. also attempted to bite Greg=s arm,
but he stopped himself before he actually bit Greg.  

Greg
said that the children are now doing very well in his home.  A.B. has a lot of superhero toys that he
likes, H.B. likes to play with food and cooking-type toys, and both children
like to play with blocks.  Greg said that
they have transitioned the children from SpongeBob to more educational
shows on television and that seems to have had a positive effect on their
developmental skills. 








Greg
testified that he had concerns about giving his address and the name of his employer
because there was a pattern in this case where information reached Father, and
then Father used the information to harass Greg or the children=s
caregivers.  Father had contacted the
pediatrician that Greg took the children to and had also e-mailed Greg.  In the e-mail, Greg received Father=s phone
number and his Metro account, which Greg used to see if Father had anything
posted on the internet.  Greg performed a
Google search and found websites that Father had set up on the internet.  Based on what he found, Greg said that he has
concerns about the children=s safety
if they are returned to Father. 

4.     Father=s Allegations Regarding the Current Foster
Parents and His Responses to Greg=s Testimony

 

While
the children were with Greg, Father noticed during a visit that H.B. had three
fingertip contusions above her buttocks. 
Father asked the investigator to look at the injuries and see if they
were accidental or intentional. 

Father
admitted that he took Greg=s e-mail
address from the discovery in this suit and responded to his accusations that
the children were returned to him after the visits with dirty diapers and
diaper rashes; Father said that it was not his fault because Mother=s visits
followed his.  Father said that he did
not contact the pediatrician that Greg took the children to. 

Father
admitted that he had posted family pictures of his children on an internet
website that he used for finding friends and dating.  Father was not aware of who looked at the
websites, but he hoped that it was adults. 
Father also admitted that he had posted nude photos of himself on a
different internet website and that it was not at all appropriate for him to do
that.  He posted the pictures right after
he was released from jail because he Awas
trying to have a little bit of fun.@  He said that the children were never exposed
to the website because they were in foster care. 








V.     Father=s
Environment

1.     Mother=s
Testimony

Mother
said that Father=s apartment smelled like dogs[60]
and that it was unclean.  Mother
therefore did not believe that Father=s
apartment was appropriate for the children. 
However, Mother said that Father had beds for the children and that she
did not have any concerns about the children being taken care of at Father=s home. 

2.     Father=s
Testimony

Father
testified at trial that he was living in a one-bedroom apartment at the Cherry
Hill Apartments, where he had lived since June 10, 2008.  Father said that his apartment was clean and
well kept and that there was always food in the refrigerator.  When the children lived with Father, H.B.
slept in her playpen in the living room,[61]
A.B. slept in his bed in the living room, and Father slept in the master
bedroom.  Father said that if the
children were returned to him, he would attempt to obtain a part-time job to
increase his income and then upgrade to a two-bedroom apartment.  He said that he would let the children have
the two bedrooms and that he would sleep in the living room. 








W.    Father=s
Finances

Throughout
the case, Father has received SSI.  He
receives a monthly disability check for $692 and a monthly SSI check for
$2.  If the children were returned to
him, he would receive a $46 check for A.B. from his Social Security.  Father said that he currently receives $200
in food stamps and that he would receive $360 to $400 per month if the children
were returned to him. 

Father
said that if he had the children, his monthly expenses would include $345 for
rent, $61 for electricity, $60 for cell phone service (to keep in contact with
his probation officer), $36 to $42 for water, $20 to $30 for diapers and
clothing for the children, and $25 for bus transportation.[62]  All of the groceries, except his cigarettes,
would be bought using food stamps.  When
asked about other expenses, such as entertainment, Father said that he was
trying to save money so that if his children were returned to him, he could buy
them the things that they needed. 








Father
said that the reason he was not currently working was because the CPS case had
taken up so much of his time that there was no time to go and get a full-time
job.  Father said that he can earn $900
per month without losing his SSI and that he is going to work full-time after
he completes technical school; he is going to be a freelance computer
technician and expects to make fifteen to twenty dollars an hour, or possibly
more. 

X.     Character Testimony

1.     Friend=s
Testimony

Diana
Michelle Gordon testified that she has known Mother and Father since the early
years of their marriage.  Gordon saw them
two or three times per month at their house. 
Gordon said that H.B. has always been small and that she saw her eating;
she did not see anything that concerned her. 
Gordon said that the children were fed, clothed, and clean and that
Mother and Father took very good care of their children.

Gordon
said that during Mother and Father=s
separation, Gordon had contact with Mother about three or four times a
month.  Mother called Gordon and asked
for Father=s phone number so that she could
talk to him about this case, and Gordon said that she could not give it to
her.  Gordon called Father and told him
about Mother=s call. 

Gordon
said that she knew of about five times when Father watched the children, but he
did not keep them while Mother worked; Mother=s sister
or a friend name Allison watched the children. 

 








2.     Apartment Complex Manager=s
Testimony

Dorene
Branum, the manager from the Cherry Hill Apartments, testified that she knew
Father because he came in to the office Aall the
time@ with
his children and visited with the office staff. 
Branum said that she saw Father with the children two or three times a
week and that the ladies in the apartment complex=s office
would watch the children while he would run upstairs to put away
groceries.  Branum said that Father was
protective of his children and would not leave them with just anyone.  Father was always good with his children; he
played with them and talked to them, and they seemed very happy.  Branum said that the children looked healthy
and taken care of and that she never saw bumps and bruises on them.  

Branum
said that Father was always pleasant. 
She did not have any problems with Father; he was very quiet, did not
associate with many people at the apartment complex, and was current on his
payments. 

3.     Groomer=s
Testimony








Mother
had provided Groomer with reports of her observations of Father=s
behaviorCincluding
his irritability, anger, instability, temper, and fitsCand
Groomer also had the opportunity to observe Father=s
behaviors for herself.  Father rarely
talked to Groomer in a nice, polite, professional manner.  Groomer said that apart from the
confrontation in the lobby at the Ben Street CPS location, she had another
confrontation with Father, but it was not that extreme.  She said that one time earlier in the case,
they had Asome words@ when
Father demanded that she do things the way he wanted them done.  When asked whether it was fair to say that
Father and Groomer did not get along well, Groomer said that she could not meet
Father=s
demands, including his demand that she immediately return his children.  Groomer said that she did not have a personal
conflict with Father, but she thought that he was a difficult person to deal
with.  Groomer, however, said that her
personal feelings did not affect her professionalism in handling this case. 

Y.     Recommendations and Requests

1.     Mother=s
Recommendation








In
Mother=s
opinion, Father would not make a good parent for the children.  She said that she would have concerns for the
safety of the children if they were returned to Father because of what A.B. has
told her and because of the pictures that she saw of A.B.=s ear
and cheek; Mother believes that if the children were placed with Father, they
would be in danger physically.  Mother
said that she had signed a relinquishment of her parental rights[63]
because she wanted her children to be safe, and she personally could not
achieve that.  When asked whether the
children would have been safe in her care, she said that they would have been
safe but that she Awanted to make sure they=ll be
safe from their father too.@  Mother agreed that she was trying to tell the
court that she did not feel that she could protect her children from Father:

I feel if I had the kids,
they would be safe in my home.  I=m not saying they wouldn=t.  But as far as me solely protecting them away
from him so that he cannot reach them or come in contact with them, no I can=t.  I don=t believe that I can, so that is why I said that
to the court. 

 

Mother
ultimately testified that one slap makes a person unfit to be a parent and that
a person should lose his parental rights for such a slap. 

2.     Burdick=s
Recommendation








Burdick
told Father that she would not recommend that his children be returned to him
because her concern was for the welfare of the children.  When asked her opinion on whether Father has
the skills to raise a four-year-old child and a three-year-old child, Burdick
said that she had concerns because Father did not take good care of himself;
she saw him only twice when he was clean and did not have an extreme odor.  She was also concerned that he was incapable
of living on the amount of money he had, that he would need more money to raise
his children, and that he had an unrealistic view of what it was going to take
to raise his children.  Further, Burdick
said that Father gets focused on something and cannot be distracted, which was
a concern since he would be in charge of small children, and Father possessed
an inability to be flexible or to change to accommodate small children. 

3.     Groomer=s
Recommendation








Groomer
testified that the children were neglected when they were in Father=s care
and that she did not believe that Father could provide a safe, stable
environment for his children.  Groomer
testified regarding her concerns about returning the children to Father:  (1) she did not see that he had benefitted
from any of the programs, even though he had completed them twice; (2) his
behaviors were of extreme concern; (3) Father did not know how to handle the
children when they were acting out because he told her, A[Y]ou
won=t let me
spank them@; (4) he had not accepted
responsibility for any of his actions; (5) he could go to jail if his probation
was revoked; and (6) she was not sure that he could take care of them
financially.[64]  Additionally, A.B. had nightmares when he
first came into care, the children had eating disorders, and there was a lack
of bonding shown during the visits. 
Moreover, the children, who were almost three and four at the time of
the trial, were Amore vulnerable@ than
children who are much older.  

Thus,
Groomer=s
recommendation to the court was to terminate Father=s
parental rights because she believed it was in A.B.=s and
H.B.=s best
interest.  Groomer believed that the
failure to thrive incident alone was sufficient to terminate Father=s
parental rights and that a single slap was sufficient to terminate a parent=s
rights.  However, Groomer said that her
recommendation to terminate Father=s
parental rights was based on everything that had happened, including the CPS
history in Missouri,[65]
H.B.=s
failure to thrive, A.B.=s injury, and Father=s
failure to show progress after completing his services. 

4.     Ad Litem=s
Recommendation








The ad
litem testified that he had relied on the testimony of several witnesses:  Oldham, who had testified that he was very
concerned about Father=s mental capacity; Conner, who
had testified that he did not see any seizures in H.B. but transported her
because of the bruises on her; Barker, who had testified that she had concerns
about the amount of food in the house, the injuries that she saw on A.B., and
A.B.=s
explanation that he had fallen; Wright, who had testified that A.B.=s
injuries were on two different planes and were not an accident; and Dr.
Lazarus, who had testified that H.B. was not gaining weight because she was not
being fed.  The ad litem recommended that
the children not be returned to Father because he did not believe that the
children would be safe. 

5.     Father=s
Requests

Father
asked the trial court to give him an opportunity to get back in his children=s
lives.  He said that he would not have
any problem with being monitored by another CPS worker if the trial court gave
him another chance.  Father said that he
was still bonding with the children because of his weekly visits and that his
children loved him. 

Father
admitted that he had told someone that if his children were returned to him, he
would move to Missouri.  He clarified
that he would only do that if he was given Athe
green light@ by the trial court; otherwise,
he would Abe glad to stay in Texas.@ 

Z.     Trial Court=s
Disposition








After
hearing the above evidence, the trial court signed a judgment terminating
Father=s
parental rights.  The trial court found
by clear and convincing evidence that Father had knowingly placed or knowingly
allowed the children to remain in conditions or surroundings which endangered
the physical or emotional well-being of the children; that Father had engaged
in conduct or knowingly placed the children with persons who engaged in conduct
which endangered the physical or emotional well-being of the children; and that
termination of the parent-child relationship with Father was in the children=s best
interest.  Following the termination
trial, the trial court held a prove-up hearing and granted Father=s
petition for divorce.  This appeal from
the judgment terminating Father=s
parental rights followed.

III.  Conduct
and Environmental Endangerment

In his
second and third issues, Father argues that there is no evidence or factually
insufficient to establish (D) and (E) termination grounds.  Specifically, Father argues that Athe
cumulative findings by the trial court would hardly justify a modification in a
custody suit, much less the termination of [his] parental rights.@[66] 

 








A.     Burden of Proof and Standards of Review

A parent=s rights
to Athe
companionship, care, custody, and management@ of his
or her children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745, 758B59, 102
S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  AWhile
parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be
sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d 17, 26 (Tex.
2002).  In a termination case, the
Department seeks not just to limit parental rights but to erase them
permanentlyCto divest the parent and child
of all legal rights, privileges, duties, and powers normally existing between
them, except for the child=s right
to inherit.  Tex. Fam. Code Ann. ' 161.206(b)
(Vernon 2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination
proceedings and strictly construe involuntary termination statutes in favor of
the parent.  Holick, 685 S.W.2d at
20B21;
In re M.C.T., 250 S.W.3d 161, 167 (Tex. App.CFort
Worth 2008, no pet.).








In
proceedings to terminate the parent‑child relationship brought under
section 161.001 of the family code, the petitioner must establish one ground
listed under subdivision (1) of the statute and must also prove that
termination is in the best interest of the child.  Tex. Fam. Code Ann. ' 161.001
(Vernon 2008); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human Servs. v. Boyd, 727
S.W.2d 531, 533 (Tex. 1987).

Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code Ann. ''
161.001, 161.206(a).  Evidence is clear
and convincing if it Awill produce in the mind of the
trier of fact a firm belief or conviction as to the truth of the allegations
sought to be established.@ Id.

' 101.007
(Vernon 2008).  Due process demands this
heightened standard because termination results in permanent, irrevocable
changes for the parent and child.  In
re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In re J.A.J.,
243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and
modification).








The
heightened clear-and-convincing burden of proof in termination cases alters the
legal sufficiency standard of review that we apply.  In reviewing the evidence for legal
sufficiency in parental termination cases, we must determine whether the
evidence is such that a factfinder could reasonably form a firm belief or
conviction that the grounds for termination were proven.  In re J.P.B., 180 S.W.3d 570, 573
(Tex. 2005).  We must review all the
evidence in the light most favorable to the finding and judgment.  Id. 
This means that we must assume that the factfinder resolved any disputed
facts in favor of its finding if a reasonable factfinder could have done
so.  Id.  We must also disregard all evidence that a
reasonable factfinder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable factfinder could and disregard contrary evidence unless a reasonable
factfinder could not.  Id.

We must
therefore consider all of the evidence, not just that which favors the
termination judgment.  Id.  But we cannot weigh witness credibility issues
that depend on the appearance and demeanor of the witnesses, for that is the
factfinder=s province.  Id. at 573B74.  When credibility issues appear in the
appellate record, we must defer to the factfinder=s determinations
as long as they are not unreasonable.  Id.
at 573.








The
heightened clear-and-convincing burden of proof in termination cases also
alters the factual sufficiency standard of review that we apply.  In reviewing the evidence following a
termination judgment for factual sufficiency, we must give due deference to the
factfinder=s findings and not
supplant the judgment with our own. 
In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We must determine whether, on the entire
record, a factfinder could reasonably form a firm conviction or belief about
the truth of the allegations that Father violated (D) or (E) and that the
termination of his parental rights would be in the best interest of his
children.  See C.H., 89 S.W.3d at
28.  If, in light of the entire record,
the disputed evidence that a reasonable factfinder could not have credited in
favor of the finding is so significant that a factfinder could not reasonably
have formed such a firm conviction or belief, then the evidence is factually
insufficient.  H.R.M., 209 S.W.3d
at 108.   When reversing on factual
sufficiency grounds, we detail in our opinion why we have concluded that a
reasonable factfinder could not have credited disputed evidence in favor of its
finding.  J.F.C., 96 S.W.3d at 266B67.

B.     Law on Endangerment








Endangerment
means to expose to loss or injury, to jeopardize.  Boyd, 727 S.W.2d at 533; In re
J.T.G., 121 S.W.3d 117, 125 (Tex. App.CFort
Worth 2003, no pet.); see also In re M.C., 917 S.W.2d 268, 269 (Tex.
1996).  To prove endangerment under
subsection (D), the Department had to prove that Father (1) knowingly (2)
placed or allowed his children to remain (3) in conditions or surroundings that
endangered their physical or emotional well‑being.  See Tex. Fam. Code Ann. '
161.001(1)(D).  Subsection (D) focuses on
dangerous conditions or surroundings that endanger the physical or emotional
well-being of the children.  In re
J.A.J., 225 S.W.3d 621, 625 (Tex. App.CHouston
[14th Dist.] 2006) (op. on reh=g), judgm=t aff=d in
part, rev=d in part by 243
S.W.3d 611 (Tex. 2007).  It focuses on
the suitability of the children=s living
conditions.  Id.  Thus, under (D), it must be the environment
itself that causes the children=s
physical or emotional well-being to be endangered, not the parent=s
conduct.  Id.








Under
(E), the relevant inquiry is whether evidence exists that the endangerment of
the children=s physical well‑being was
the direct result of Father=s
conduct, including acts, omissions, or failures to act.  See J.T.G., 121 S.W.3d at 125; see
also Tex. Fam. Code Ann. '
161.001(1)(E).  Additionally, termination
under (E) must be based on more than a single act or omission; the statute
requires a voluntary, deliberate, and conscious course of conduct by the
parent.  J.T.G., 121 S.W.3d at
125; see Tex. Fam. Code Ann. ' 161.001(1)(E).  It is not necessary, however, that the parent=s
conduct be directed at the children or that the children actually suffer
injury.  Boyd, 727 S.W.2d at 533; J.T.G.,
121 S.W.3d at 125.  The specific danger
to the children=s well‑being may be
inferred from parental misconduct standing alone.  Boyd, 727 S.W.2d at 533; In re R.W.,
129 S.W.3d 732, 738 (Tex. App.CFort
Worth 2004, pet. denied).  To determine
whether termination is necessary, courts may look to parental conduct occurring
both before and after the children=s
birth.  In re D.M., 58 S.W.3d 801,
812 (Tex. App.CFort Worth 2001, no pet.). 

C.     Evidence Is Legally Sufficient to Support
Termination

We first
address whether the evidence is legally sufficient to support termination of
Father=s
parental rights pursuant to (D) or (E)Cthat is,
whether Father (1) knowingly placed or knowingly allowed A.B. and H.B. to
remain in conditions or surroundings that endangered their physical or
emotional well-being or (2) engaged in conduct or knowingly placed the children
with persons who engaged in conduct that endangered their physical or emotional
well-being.  See Tex. Fam. Code
Ann. '
161.001(1)(D), (E).  The Department=s brief
contains a combined legal and factual sufficiency analysis in which it focuses
on five acts or omissions by Father that it contends support termination of
Father=s rights
under (D) and (E):  the allegations that
Father bruised A.B. by slapping him in July 2008; that Father knew that H.B.
was failing to thrive in September 2007; that the children witnessed domestic
violence; that Father had emotional difficulties; and that Father did not
provide a safe environment for his children.[67]  We will examine all of the evidence in the
record, focusing on these allegations.








After
Father and Mother separated, a doctor diagnosed H.B. as failing to thrive.  Contradictory evidence exists concerning how
frequently H.B. was in Father=s care
during this time, but viewing the evidence in the light most favorable to the
termination judgment, evidence exists that Father cared for H.B. to some extent
around the time of the failure-to-thrive diagnosis when H.B.=s growth
was so stunted that she was Afalling
off the growth chart.@ 
Thus, evidence exists supporting an inference that Father knew of and
contributed to H.B.=s failure to thrive and that
consequently Father=s conduct, including omissions,
created an endangering environment for H.B. by underfeeding her.[68]








A.B.
received bruises while in Father=s
care.  CPS and medical personnel at the
hospital documented several bruises of varying ages on A.B., including what
appeared to be a slap mark on his face and a bruise on both sides of A.B.=s
ear.  Concerning the bruise to his ear,
A.B. told several people that Father had tried to pull his ear off.  Viewing this evidence in the light most
favorable to the termination judgment, evidence exists that Father slapped A.B.=s face
and/or pinched his ear, causing significant bruising.  Although medical tests ruled out any
additional injuries to A.B. from the slap and/or pinch by Father, a medical
expert testified that all injuries to a child=s head
are potentially severe.  Thus, evidence
exists that, on at least one occasion, Father inflicted a potentially severe injury
to A.B.=s
head.  Concerning A.B.=s other
bruises, medical personnel opined that these other bruises were not consistent
with accidental falls because of their locations.  This evidence is some evidence that Father=s
conduct physically endangered A.B.  

A.B.
reenacted a fight between Mother and Father that involved Father=s
pushing Mother and Mother=s falling.  This evidence is some evidence that Father=s
conduct directed toward Mother created an environment that endangered A.B.=s
emotional or physical well-being.  








Some
evidence exists that CPS caseworkers found that Father failed to maintain a
living environment suitable for the children because of clutter, smoke, and
odors that filled his apartment.  Father
resolved the other alleged deficiencies in the physical home that he provided
for A.B. and H.B.  Likewise, evidence
exists in the record of Father=s
history of mental and emotional instability; Father admitted that he had been
diagnosed with bipolar disorder, and he exhibited mood swings and was
belligerent toward CPS workers and the police. 
But no witness testified and no evidence exists that Father=s mental
and emotional problems caused consequences to A.B. or H.B.  We are not aware of any case law, and none
has been cited to us, holding that these acts or omissions by FatherCclutter
and odors in the home and having been diagnosed with mental and emotional
problemsCconstitute
endangering the children, absent evidence that these acts or omissions actually
did result in some physical or emotional danger to A.B. or H.B.  Absent such testimony, this evidence is no
evidence in support of termination under (D) or (E).

Viewing
all the evidence in the light most favorable to the termination judgment and
disregarding all contrary evidence that a reasonable factfinder could
disregard, we hold that some evidence exists that will support a factfinder=s firm
conviction or belief that Father violated subsection (D) and (E), and we
overrule the part of Father=s second
and third issues challenging the legal sufficiency of the evidence to support
the termination of his parental rights to A.B. and H.B.  See In re J.P., No. 02-07-00026-CV,
2008 WL 283295, at *11 (Tex. App.CFort
Worth Feb. 4, 2008, no pet.) (mem. op.) (holding that evidence was legally
sufficient to support termination when record revealed some evidence that appellant
had history of mental instability, failed to maintain a clean living
environment, and did not demonstrate appropriate parenting skills).

D.     Evidence is Factually Insufficient to
Support Termination








We next
address whether the evidence is factually sufficient to support termination of
Father=s
parental rights pursuant to (D) or (E); that is whether Father (1) knowingly
placed or knowingly allowed A.B. and H.B. to remain in conditions or
surroundings that endangered their physical or emotional well-being and (2)
engaged in conduct or knowingly placed the children with persons who engaged in
conduct that endangered their physical or emotional well-being.  See Tex. Fam. Code Ann. '
161.001(1)(D), (E).  We review all of the
evidence in a neutral light, including the evidence concerning the five
allegations set forth above and relied upon by the Department as establishing
(D) and (E) grounds for terminationCthat
Father bruised A.B. by slapping him in July 2008, that Father knew that H.B.
was failing to thrive in September 2007, that the children witnessed domestic
violence, that Father had emotional difficulties, and that Father did not
provide a safe home for his children.

1.     Injuries to A.B.CFactually
Insufficient (E) Ground








Medical
tests established that A.B. had no underlying injuries beyond his
bruising.  His bruising injuries included
red marks underneath and on one side of his eye, an old bruise on his left
eyebrow, red scattered dot-type marks on his left cheek, purple  bruising in and around his left ear, linear
marks or a Aslap mark@ on the
left side of his face, and a small bruise on his abdomen and on his
buttock.  Concerning the bruise to A.B.=s left
ear and the linear marks on the left side of his face, A.B. and Father both
said that A.B. had fallen.  Later, A.B.
said that Father had Atried to pull his ear off,@ but
A.B. never told anyone that Father had slapped him.  Although medical personnel testified that
because the bruises on A.B.=s
abdomen and buttocks were not on boney prominences, they were likely not the
result of an accidental fall; medical personnel did not rule out other causes
of accidental bruising to a three-year-old toddler like A.B. from bumping into
things, sitting on things, or from accidents other than falling.  Medical personnel testified that A.B.=s
bruisesCother
bruises to A.B.=s face and earCwere of
varying ages, but no one testified whether they were less than or more than a
month old.  In other words, whether they
occurred before or after Father regained possession of A.B.[69]








Father
testified that he had pleaded guilty to injury to A.B. in order to obtain
probation so that he could work his service plan, but he was adamant that he
did not slap A.B., even going so far as to take a polygraph examination in an
attempt to prove his innocence.  Mother
testified that in all her years with Father, A.B.=s
statement regarding his ear is the only incident that she was aware of in which
her son complained that Father may have injured him.  The record contains no evidence of physical
injuries to the children prior to Barker=s second
visit to Father=s apartment one month after he
regained possession of the children; likewise, the CPS referral in Missouri was
not based on any injuries to A.B. (H.B. had not been born).

Termination
under subsection (E) may not ordinarily be based on a single  transaction, but rather Aa
showing of a course of conduct is required.@  In re D.P., 96 S.W.3d 333, 338 (Tex.
App.CAmarillo
2001, no pet.); see also In re D.T., 34 S.W.3d 625, 634 (Tex. App.CFort
Worth 2000, pet. denied) (A[A]
voluntary, deliberate, and conscious >course
of conduct= by the parent is required.@).  Conduct similar to Father=s may be
insufficient even under the preponderance of the evidence standard to modify
conservatorship of a child. See Stucki v. Stucki, 222 S.W.3d 116, 123B24 (Tex.
App.CTyler
2006, no pet.) (upholding joint managing conservatorship even though father had
hit child on the head with a book hard enough to give her a headache); see
also In re B.R.P., No. 11-07-00255-CV, 2009 WL 1349954, at *2B3 (Tex.
App.CEastland
May 14, 2009, no pet.) (mem. op.) (holding that father=s slap
that left a red mark on child=s face
for two days did not cause substantial harm to require change of
conservatorship).  Thus, viewing all of
the evidence in a neutral light, the evidence that Father pinched A.B.=s ear
and/or slapped A.B.=s face and that A.B. had other
small bruises on his body is factually insufficient to establish a firm
conviction or belief that Father engaged in an endangering course of conduct
from June 10, 2008 to July 8, 2008.








2.     H.B.=s Failure to ThriveCFactually Insufficient
(D) or (E) Grounds

 

The
record before us is likewise factually insufficient to establish that Father
knew of H.B.=s failure to thrive.  Father testified that Mother took H.B. to the
doctor for her check-ups.  He said that
he did not attend H.B.=s doctor visits with Mother that
often because she did not allow him to go; no contrary evidence exists in the
record.  Father testified that he was a
small child and eventually took growth hormones and that he believed H.B. was
small because she took after him.  Mother
testified that the doctors thought H.B. was small like Father and that the
doctors did not tell Mother to alter H.B.=s
feedings.








The
paramedic who responded when H.B. suffered seizures testified that H.B. Alooked a
little underweight for her size@ but was
not emaciated and that the main reason he took her to the hospital was
due to the abrasion on her head from being hit by a toy, not her weight.[70]  Medical personnel from the hospital testified
that H.B.=s failure to thrive would be
less obvious to those who saw H.B. frequently, that it would be difficult for a
parent to know of the problem unless he had been told by a doctor, and that the
parents should have been told of H.B.=s growth
issues at a well-baby exam.  Mother
testified that she was never told of any growth issues with H.B. before H.B.
was taken to the hospital for seizures. 
Father testified that H.B. ate baby food and Atable
scraps@ and
that she drank whole milk.  Moreover,
Father, Mother,[71]
and Gordon testified that after Father and Mother separated, Jennifer W. kept
the children from 3:00 p.m. to midnight while Mother worked; Jennifer W. and
Hall testified that Father kept the children while Mother worked.  Assuming that Jennifer W. and Hall are
correct, Father would only have had the children during one meal time.  And the record reflects that, according to
Ms. Cornelius=s affidavit, Mother=s
apartment was barren of food other than Sprite. 








Termination
under (D) requires that Father Aknowingly@ placed
or allowed his children to remain in conditions or surroundings that endangered
their physical or emotional well‑being. 
See Tex. Fam. Code Ann. '
161.001(1)(D).  Viewing all of the
evidence in the record in a neutral light, the evidence is factually
insufficient for a reasonable finder of fact to form a firm conviction or
belief that Father knowingly allowed H.B. to be underfed.  See, e.g., In re J.R., 171 S.W.3d 558,
571 (Tex. App.CHouston [14th Dist.] 2005, no
pet.) (holding evidence legally insufficient to show Mother knowingly allowed
children to remain in endangering environment when she moved in with sex
offender and record failed to show she knew of conviction for sex offense).

3.     Domestic ViolenceCFactually
Insufficient (D) Ground








A.B.
reenacted a fight between Father and Mother during which Father pushed Mother
and Mother fell.  No evidence exists,
however, that domestic violence between Father and Mother resulted in physical
injury to the children, and Mother never testified that she had to seek medical
treatment as a result of such domestic violence.  In fact, Mother testified that Father was
never physically violent to the children and that she trusted Father with the
children, despite the domestic violence that had occurred between her and
Father, because he had never harmed the children; Mother said that in all her
years with Father, A.B.=s statement regarding his ear
was the only incident that she is aware of in which her son complained that
Father may have injured him. 
Additionally, Father could not be certain that the children saw Mother
punch him in the face at his apartment after the separation because the
children were in the bedroom.  Moreover,
Father divorced Mother, so domestic violence between them will not be a
continuing issue.  Viewing all of the
evidence in the record in a neutral light, factually insufficient evidence
exists for a reasonable finder of fact to form a firm conviction or belief that
the children had been placed in a dangerous environment because of the domestic
violence between Father and Mother.  See
In re A.S., 261 S.W.3d 76, 84B85 (Tex.
App.CHouston
[14th Dist.] 2008, pet. denied) (holding that evidence was legally and
factually insufficient to support termination of mother=s
parental rights under (D) when, even assuming father=s
behavior was abusive and had occurred in front of the children, mother had
taken responsive action to protect the children by taking them out of the
environment); see also Lewelling v. Lewelling, 796 S.W.2d 164, 167 (Tex.
1990) (holding in conservatorship case Athat a
parent is a victim of spousal abuse, by itself, is no evidence that awarding
custody to that parent would significantly impair the child@).

4.     Father=s Mental and Emotional DifficultiesCFactually Insufficient
(D) or (E) Grounds

 








While
the evidence establishes that Father suffered from bipolar disorder and anger
issues, no evidence links these mental and emotional problems to endangering
conduct by Father.  Father testified that
he was aware of his bipolar disorder and of how his moods fluctuated, and the
record reveals that he took medication for his bipolar disorder, even though he
did not want to, because he wanted his children back.  The evidence in the record concerning Father=s mental
and emotional difficulties is not in this case evidence of (D) or (E) grounds;
the Department did not seek termination under section 161.003.  See Tex. Fam. Code Ann. ' 161.003
(Vernon 2008) (authorizing termination of parent-child relationship under
certain circumstances based on mental or emotional illness of parent); see
also, generally, In re A.L.M., 300 S.W.3d 914, 919B20 (Tex.
App.CTexarkana
2009, no pet.).

5.     Father=s
ApartmentCFactually Insufficient (D) or
(E) Grounds








The
record reflects that the Department returned the children to Father to live
with him at his apartment one month before their involuntary removal.  Father complied with the Department=s
requests concerning his apartment.  He
used the sheets that the VOA gave him and purchased food to keep on hand even
when the children were not living with him. 
Although Oldham gave his lay opinion that Father=s
apartment was not suitable for small children because it was messy and
cluttered when he viewed it approximately one month before trial, he did not
explain how the children would be harmed by the mess or clutter that he
noted.  Father=s
apartment was obviously clean enough for the children to be returned to him in
June 2008, so the record demonstrates that Father had the capability to provide
a clean living space for the children when necessary.  See J.A.J., 225 S.W.3d at 625B26
(holding evidence legally insufficient to support termination under (D) when
appellant worked to improve her living situation after son was taken into State
custody); J.R., 171 S.W.3d at 577 (holding evidence factually
insufficient to establish by clear and convincing evidence that (D) or (E)
grounds existed based on alleged unsanitary living environment); accord M.C.,
917 S.W.2d at 269B70 (upholding termination under
prior standard of review based on Aextraordinarily
unsanitary conditions@ when children=s home
was roach infested; children ate food off of floor and out of garbage; floor
and furniture were littered with food, garbage, dirty clothes, and feces; one
child had dead cockroaches matted in her hair; infant had dead cockroaches in
her bottle; and one summer, mother moved children into house that lacked
plumbing or drinking water).

6.     Other Evidence

Father
worked two service plansCunder the FBSS plan, he attended
parenting classes, completed a psychological consultation and a psychiatric
evaluation, attended seven sessions of individual counseling, and completed an
anger management course; under the CPS plan, he completed individual
counseling, parenting classes, an anger management course, and a psychological
consultation; had no positive drug tests; and maintained the same residenceCall
while never missing a visit with his children.

Father
contended throughout trial that various caseworkers had a vendetta against him;
these contentions are somewhat supported by evidence in the record that one of
Father=s
caseworkers, Groomer, of her own accord, contacted Father=s
probation officer to make allegations against Father that were not relevant to
his children.








Various
witnesses urged the trial court to terminate Father=s
parental rights based on evidence that is not evidence of endangerment under
(D) or (E).  Burdick urged termination of
Father=s
parental rights, saying she was concerned for the children because Father had
an extreme odor and needed more money to raise the children.  Groomer urged termination of Father=s
parental rights because she did not think that Father had benefitted from the
services or that Father could provide a safe environment.  Groomer also testified on one occasion that
the family plan moved from reunification to termination based on Father=s
conduct toward her.

Although
Father was apparently not congenial in his dealings with caseworkers, had Aan
extreme odor,@ was not well off financially,
had a cluttered and messy apartment, was persistent to the point of being
annoying and somewhat belligerent to caseworkers with his calls and e-mails
concerning his children, and did notCin one
person=s
opinionCexhibit Aany
behavioral changes or improvement in [his] character after completing programs,@ this
evidence is not evidence of endangerment under (D) or (E).








Likewise,
evidence exists that the children demonstrated physical and mental improvement
while they were in foster care.  Their
language skills, social skills, and physical health improved.  While these facts, as well as the various
witnesses= opinions on Father=s
parenting abilities,[72]
are evidence of the best interests of the children, they are not evidence that
Father violated subsections (D) or (E).

7.     A Reasonable Factfinder Could Not Reasonably Have Formed A Firm
Conviction or Belief That Father Violated Subsection (D) or (E) 

 








Viewing
all of the evidence in a neutral light, the volume of disputed evidenceCset
forth extensively aboveCthat a reasonable factfinder
could not have credited in favor of subsection (D) and (E) findings is so
significant that a factfinder could not reasonably have formed a firm
conviction or belief of the truth of the allegations that Father violated
subsections (D) or (E).  See C.H.,
89 S.W.3d at 28; H.R.M., 209 S.W.3d at 108.  Because the evidence viewed in a neutral
light cannot produce in the mind of the trier of fact a firm belief or
conviction as to the truth of the allegations sought to be established under
subsections (D) and (E), factually insufficient exists to support termination
of Father=s parental rights under
subsections (D) and (E).  See Tex.
Fam. Code Ann. ' 161.001(1)(D), (E); J.P.,
2008 WL 283295, at *12 (holding that appellant=s mental
health issues, her living conditions, and her parenting skills did not rise to
the level of endangerment when considered in context with the other evidence in
the record).  We sustain the part of
Father=s second
and third issues challenging the factual sufficiency of the evidence to support
the termination of his parental rights to A.B. and H.B.  See Santosky, 455 U.S. at 758B59, 102
S. Ct. at 1397; M.S., 115 S.W.3d at 547; Holick, 685 S.W.2d at 20B21;
M.C.T., 250 S.W.3d at 167.

IV. 
Legally Sufficient Evidence Exists Supporting Best Interest Finding

In his
fourth issue, Father challenges the legal and factual sufficiency of the
evidence to support the trial court=s
finding that it was in his children=s best
interest for his parental rights to A.B. and H.B. to be terminated.  Because we have concluded that the evidence
is factually insufficient to support termination under (D) or (E), we need not
address whether there was factually sufficient evidence to support the trial
court=s best
interest finding.  See Tex. R.
App. P. 47.1.  However, because we have
held that there was legally sufficient evidence to support the trial court=s
findings under (D) or (E), and because a holding of legally insufficient
evidence to support the trial court=s best
interest finding would entitle Father to greater relief than what he is
afforded under a factual insufficiency holding, we will analyze whether legally
sufficient evidence exists to support the trial court=s best
interest finding.

 

 








A.     Standard of Review

There is
a strong presumption that keeping children with a parent is in the children=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Prompt and
permanent placement of the children in a safe environment is also presumed to
be in the children=s best interest.  Tex. Fam. Code Ann. ' 263.307(a)
(Vernon 2008).  The following
factors should be considered in evaluating the parent=s
willingness and ability to provide the children with a safe environment:

(1) the children=s ages and physical and
mental vulnerabilities;

 

(2) the frequency and
nature of out‑of‑home placements;

 

(3) the magnitude,
frequency, and circumstances of the harm to the children;

 

(4) whether the children
has been the victim of repeated harm after the initial report and intervention
by the department or other agency;

 

(5) whether the children
are fearful of living in or returning to the child=s home;

 

(6) the results of
psychiatric, psychological, or developmental evaluations of the children, the
children=s parents, other family
members, or others who have access to the children=s home;

 

(7) whether there is a
history of abusive or assaultive conduct by the children=s family or others who
have access to the children=s home;

 








(8) whether there is a
history of substance abuse by the children=s family or others who have access to the
children=s home;

 

(9) whether the
perpetrator of the harm to the children is identified;

 

(10) the willingness and
ability of the children=s family to seek out,
accept, and complete counseling services and to cooperate with and facilitate
an appropriate agency=s close supervision;

 

(11) the willingness and
ability of the children=s family to effect
positive environmental and personal changes within a reasonable period of time;

 

(12) whether the children=s family demonstrates
adequate parenting skills, including providing the children under the family=s care with:

 

(A) minimally adequate
health and nutritional care;

 

(B) care, nurturance, and
appropriate discipline consistent with the children=s physical and
psychological development;

 

(C) guidance and
supervision consistent with the children=s safety;

 

(D) a safe physical home
environment;

 

(E) protection from
repeated exposure to violence even though the violence may not be directed at
the children; and

 

(F) an understanding of
the children=s needs and capabilities;
and

 

(13) whether an adequate
social support system consisting of an extended family and friends is available
to the children.

 








Id. ' 263.307(b);
R.R., 209 S.W.3d at 116.

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the children include (A) the desires of the
children, (B) the emotional and physical needs of the children now and in the
future, (C) the emotional and physical danger to the children now and in the
future, (D) the parental abilities of the individuals seeking custody, (E) the
programs available to assist these individuals to promote the best interest of
the children, (F) the plans for the children by these individuals or by the
agency seeking custody, (G) the stability of the home or proposed placement,
(H) the acts or omissions of the parent which may indicate that the existing
parent‑child relationship is not a proper one, and (I) any excuse for the
acts or omissions of the parent. 
Holley, 544 S.W.2d at 371B72. 

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when
appropriate.  C.H., 89 S.W.3d at
27.  Furthermore, undisputed evidence of
just one factor may be sufficient in a particular case to support a finding
that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

 








B.     Evidence Supporting Best Interest Finding

In
addition to the facts detailed above, the record contains other facts
supporting the factors listed above, with the exception of the children=s wishes
because they did not testify.  The
children were three and four at the time of the trial and were vulnerable, according
to Groomer.  They had been placed outside
Father=s home
twice.  The foster parents reported that
after visits with Father, the children had nightmares, and their behavior
reverted to being more infant-like.  The
children also exhibited developmental delays. 
Father had trouble being flexible and expressed that he did not know how
to discipline the children without spanking them.  Father=s
ability to provide nutritious meals for the children was questioned, and Father
had no other family in the area to help him raise his children.  As mentioned above, evidence exists that the
children demonstrated physical and mental improvement while they were in foster
care; their language skills, social skills, and physical health improved.  Thus, the plan, as stated in the record, was
for Greg=s family
to adopt the children.








Viewing
the evidence in the light most favorable to the termination judgment, we hold
that the evidence is legally sufficient to support the trial court=s best
interest finding.  See Horvatich v.
Tex. Dep=t of Protective & Regulatory
Servs., 78 S.W.3d 594, 601, 604 (Tex. App.CAustin
2002, no pet.) (holding evidence legally sufficient to support best interest
finding but factually insufficient to support best interest finding); see
also In re S.G.S., 130 S.W.3d 223, 240B41 (Tex.
App.CBeaumont
2004, no pet.) (holding evidence legally sufficient to support trial court=s best
interest finding).  We therefore overrule
the portion of Father=s fourth issue challenging the
legal sufficiency of the evidence.

V.  Due Process
Rights Were Not Violated By Denial of Expert Witness Fees

As
mentioned above, in an attempt to prove his innocence regarding slapping A.B.,
Father took a polygraph exam on March 26, 2009. 
After making some pre-test statements, the polygraph examiner asked
Father whether he had put any bruises on A.B.=s face, whether
he had hit A.B. putting a bruise on his face, and whether Father had caused
A.B.=s face
to hit anything bruising him; Father answered Ano@ to each
of the three questions.  The evaluation
of the polygraph results failed to reveal criteria indicative of deception to
the relevant questions.  Father attempted
to introduce the polygraph results at trial, and the trial court excluded the
polygraph results and any discussion regarding the polygraph exam.[73]









In his
first issue, Father argues that the trial court violated his due process rights
by denying him access to expert witness fees. 
Specifically, Father argues that the trial court erred by denying his
request for expert witness fees so that he could pay an expert to lay the
predicate for introducing polygraph exam results into evidence.  Father acknowledges that this court has
previously ruled that due process is not denied by the refusal to provide
expert witness fees in termination cases, see J.T.G., 121 S.W.3d at 130,
and that he has found no Texas case applying the criminal due process right to
an expert to parental rights termination cases. 
Because we also find no case law applying the criminal due process right
to parental rights termination cases, we overrule this portion of Father=s first
issue.








Father
also argues in his first issue in his brief and in his oral argument that he
should have been allowed broad discretion (i.e., introducing results from the
polygraph exam that he took) in challenging the State=s
caseworkers= biases and prejudices. 

Generally,
the admission and exclusion of evidence is committed to the sound discretion of
the trial court.  See Owens-Corning
Fiberglass Corp. v. Malone, 972 S.W.2d 35, 43 (Tex. 1998).  To determine whether a trial court abused its
discretion, we must decide whether the trial court acted without reference to
any guiding rules or principles; in other words, we must decide whether the act
was arbitrary or unreasonable.  Low v.
Henry, 221 S.W.3d 609, 614 (Tex. 2007); Cire v. Cummings, 134
S.W.3d 835, 838B39 (Tex. 2004).








Although
Father argues that he should have been able to ask whether the CPS caseworkers
considered the polygraph exam in deciding to recommend the termination of his
parental rights, the record reveals that he did not attempt to do this at
trial.  Instead, he attempted to discuss
the results during his testimony, and the trial court excluded the polygraph
results and the discussion regarding the polygraph exam.  The trial court did not have the opportunity
to rule on the specific issue that Father raises here because this issue was
not before it.  See Banda v. Garcia,
955 S.W.2d 270, 272 (Tex. 1997) (stating that the complaint on appeal must be
the same as that presented in the trial court). 
Therefore, on the record before us, we cannot say that the trial court
abused its discretion by not allowing Father to cross-examine the CPS
caseworkers on whether they considered the polygraph examination results in
making their decision to recommend terminating his parental rights because
Father never attempted to question the caseworkers on that issue at trial.  See id. (holding that appellate court
cannot reverse based on a complaint not raised in the trial court); see
generally Tennard v. State, 802 S.W.2d 678, 683 (Tex. Crim. App. 1990)
(holding that the existence and results of polygraph examinations are
inadmissible for all purposes on proper objection), cert. denied, 501
U.S. 1259 (1991).  We overrule the
remainder of Father=s first issue.

VI.  Conclusion

Having
determined that the evidence is factually insufficient to support the trial
court=s
findings under family code section 161.001(1)(D) and (E), we reverse the trial
court=s
judgment and remand for a new trial.

 

        SUE WALKER

        JUSTICE

 

PANEL:  WALKER and MCCOY, JJ.; and DIXON W. HOLMAN
(Senior Justice, Retired, Sitting by Assignment).

 

DELIVERED:  July 29, 2010











[1]See Tex. R. App. P. 47.4.





[2]For ease of reading,
these subsections are hereinafter referred to simply as A(D)@ and A(E).@





[3]We recognize that some of
the witnesses= testimony is conflicting
and inconsistent.  This factual
background section of our opinion, however, sets forth the testimony given,
even when it is inconsistent or even apparently incorrect.





[4]At the time of the
termination trial, although Mother was still married to Father, a divorce
action was pending, and Mother was pregnant with her boyfriend=s child. 





[5]Although Mother=s parental rights to A.B.
and H.B. were terminated at the same time as Father=s, she did not appeal the
judgment.  We include her testimony as it
pertains to the endangering conduct and endangering environment findings that
the trial court made when it terminated Father=s parental rights to A.B.
and H.B.; however, we omit testimony regarding Mother=s compliance with her
service plan and do not attempt to analyze whether the termination of her
parental rights was proper because that issue is not before us.





[6]Jennifer W. testified
that she had noticed bruises on Mother, and Mother initially told her that she
had bumped into a wall or had hit herself. 
After Mother separated from Father, Mother said that Father had hit her
and caused the bruises.  Mother told
Jennifer W. that she had separated from Father because he was being very
abusive toward her. 





[7]H.B.=s medical records
revealed that Mother said that Jennifer W. watched the children while Mother
was at work and that Father watched the children Asometimes.@ 





[8]Jennifer W. said that
Mother never lived with her; Mother went straight from Father=s apartment into her own
apartment.  Jennifer W. did not provide
babysitting services to Mother and Father=s children while they were separated; Mother told
Jennifer W. that Father watched the children while she worked from 3:00 p.m. to
midnight. 





[9]Jennifer W. said that
Mother and the children had visited her frequently prior to H.B.=s hospitalization, so
Jennifer W. had lots of opportunities to see the children.  Jennifer W. was very concerned about H.B.=s appearance from July
through September 2007 and told Mother that H.B. did not look healthy. Mother
told Jennifer W. that she had a doctor=s appointment for H.B., but there was never an
appointment.  It was obvious to Jennifer
W. that H.B. was in distress.  Jennifer
W. told Mother that if she needed help with formula or food that she would help
her.  Father was there during that time,
so he knew Jennifer W. was concerned. 





[10]Father said that Mother
did not let him go with her to the children=s pediatrician appointments often. 





[11]Conner said that he
noticed that the home was dirty.  He said
that there were a lot of dirty dishes in the sink, and pots and pans were still
sitting on the stove.  Conner described
Mother=s apartment as an unclean
environment that was below standards because its only contents were a bottle of
Sprite, an air mattress, and a car seat. 





[12]The medical charts that Dr.
Lazarus reviewed also noted that H.B. had developmental delays; she did not
crawl, pull up, walk, or sit up alone, which would have been normal tasks for a
fifteen-month-old child.  There was
concern about H.B.=s brain growth because
her head circumference was small and was falling off the growth curve, but H.B.=s CT scan was normal. 





[13]Father called the CPS
office on September 30, 2007, and talked to Hall. He also said that H.B.=s injury was caused by
A.B.=s throwing a Buzz
Lightyear toy at her.  Hall said that the
injury looked consistent with the explanation that Mother and Father had given.






[14]Hall said that there were
some discrepancies about what Mother did throughout the day; Mother said that
they were at the lake all day and then said that they were there for only
fifteen minutes.  





[15]Father told Hall that he
was unemployed and received Social Security Income (SSI), but he did not
explain to her why he was receiving SSI. 





[16]La=Morra Cornelius, a
caseworker for the family, averred in her affidavit that the reasons for the
voluntary placement included H.B.=s health and severe developmental delays, as well
as the home environment in which she lived. 





[17]Hall saw A.B. and noted
that he was in good health; he was clean and appeared to be of normal height
and weight. 





[18]Barker admitted that it
was an older apartment and that the stains on the carpet were something that
the landlord would have to take care of. 
Barker said that Father did not have any pets. 





[19]Father said that his
cooking skills were A[n]ot the best in the
world@ but that he could cook
microwave food and some on the stove. 
When A.B. was three, he was eating Atable scraps@:  green
beans, vegetables, and normal food that Mother and Father ate.  Father said that they mostly had weaned H.B.
from her bottle at one year and that she ate small Atable scraps.@  She was Aeating as much table food as she could take in.@ 





[20]Father said that the
children were watching television and could have seen Mother hit her face on
the bedroom door, but he could not guarantee that they saw it. 





[21]Although Father described
the previous event as taking place on June 16, 2008, it appears that the
following event is the one that took place on June 16, 2008, because it matches
the description in the police citation. 





[22]At that time, Father had
moved into the Woodhaven apartment complex in east Fort Worth. 





[23]Barker said that the fact
that both children had dirty diapers when they awakened would not in and of
itself be surprising, but Athey were very wet and very full, which tends to
make you feel like that they were on for quite sometime.@ 





[24] Barker testified that
she did not see any bruising on the children during her July 1 visit.  





[25]Barker testified that
A.B. had limited verbal skills and was saying Amaybe three-word
sentences.@ 





[26]Barker testified that
this was only the second time in her twelve years with the VOA that she had to
report abuse. 





[27]Brooks testified that
Father never talked to her in a calm manner while she was at his apartment; he
was loud, verbally abusive, constantly aggressive, and constantly on the
attack.  And although he never struck
anyone, she was glad that she had police officers with her.  Brooks explained that she was not Father=s caseworker and that
Father wanted his caseworker, Ms. Cornelius. 





[28]Brooks said that she was
outside Father=s home for about three or
four hours and that she was inside for only five or ten minutes. 





[29]Father had asked Brooks to
Acheck out@ the doctors that he saw
when he was young so that she would realize that H.B. did not have a
failure-to-thrive problem but rather that she had a growth hormone problem just
like he had when he was growing up.





[30]When Brooks went to
investigate the referral, she did not know that there was a prior CPS case in
Missouri; she found that out later in her investigation.  Father had mentioned that he was from
Missouri, so Brooks called the state and requested that they check to see if
Father had any CPS history.  Missouri
responded to Brooks=s inquiry and sent CPS
records.  





[31]Brooks described Father
as Aso aggressive and so loud
and in your face@ and said that several
times, Apeople had to come in and
tell him to be quiet or they were going to have him taken out of the hospital.@  Brooks said that Father quieted down for a
little bit, but then he became angry when he found out that the doctors had
examined H.B.=s private parts; he said
that she had been violated. 





[32]Brooks read from her
investigation report that Father Atold Corporal Blanchard to suck his dick and he
grabbed his crotch and thrust it toward him.@ 





[33]The e-mails were not
admitted into evidence; Brooks testified that her e-mails were ultimately deleted
because her part of the case was closed. 





[34]All of A.B.=s injuries were on the
left side of his face, with the exception of one bruise that was fading on his
right cheek. 





[35]Dorene Branum, the
manager of the apartment complex where Father lived, testified that there was a
large gate railing in the front of the apartment complex. 





[36]Father said that A.B. was
Apretty verbal,@ but he did not speak in
full sentences. 





[37]Mother was in the midst
of potty training A.B. when she voluntarily placed him with Jennifer W., and
Mother had talked to Father about having trouble potty training A.B.  However, she never saw Father take A.B. by
the ear to the bathroom. 





[38]Although the Department
did not move for termination of Father=s parental rights based on any failure to
complete his service plan, see Tex. Fam. Code Ann. ' 161.001(1)(O), we
include a discussion of the services that he worked because it is relevant to
the endangering conduct and endangering environment grounds that the Department
pleaded in its petition to terminate Father=s parental rights.





[39]Groomer determined that
Father needed to participate in batterer=s intervention based on the previous case file,
which included in the investigation that A.B. had told CPS that Father had
knocked down Mother, had hit her, and had made her cry.  Groomer was not aware that Mother had been
charged with domestic violence. 





[40]Groomer requested that
Father complete another psychological consultation, even though Father had
completed one the year before, because Father had attended parenting classes
and had completed other services for the Department, which could have made the
outcome of the psychological consultation different from the previous one. 





[41]Groomer testified that
the inclusion of the drug-free education in a service plan does not necessarily
indicate that the parent has a drug problem. In this case, Groomer testified
that she had no evidence that Father used drugs, though there was evidence of Avery erratic behaviors.@  





[42]Father said that he was
appealing his conviction for injury to a child and that it would be overturned.






[43]Groomer said that the
services on Father=s plan were actually
offered back in August 2008. 





[44]Father gave Burdick some
paperwork showing that he had been diagnosed with a personality disorder.  





[45]Father said that he had
taken the two children to the store and that on the way back into the apartment
complex, A.B. had tripped and fallen over something and had hit the side of his
head.  Father told her that he had
pleaded guilty to injury to A.B. because he was coerced by his attorney and the
courts. 





[46]In Burdick=s counseling with Mother,
Mother said that Father was verbally and physically violent toward her. 





[47]Although Burdick
testified that Father told her that he received a ticket as a result of the
June 16 incident, the record does not bear this out.  As set forth above, Mother received a
citation for the June 16, 2008 incident.





[48]Father said that one
thing he could have done better under his service plan was to have better
interaction with Burdick in counseling, but he felt like he had gotten
everything that he could out of the services. 





[49]It is difficult to
determine when the plan changed from family reunification to termination
because Groomer could not recall when she, her supervisor, and the program
director made the decision to seek termination of Father=s parental rights.  Groomer said that on September 30, 2008, at the
status hearing, they decided to make the change from family reunification to
termination.  Later, Groomer read an
e-mail that she had sent on January 29, 2009, in which she said that A[t]he current permanency
goal is family reunification, but Nora and I have discussed this and we feel it
should be changed to alternative family unrelated adoption.@  At the end of the February 24, 2009
permanency conference, the district supervisor announced that the goal was to
work a dual planCfamily reunification
would be worked side by side with termination. 
When Groomer was asked whether her decision to terminate happened in
April after the incident in the CPS lobby, she said, AYes, on that date due to
his behaviors.@  However, Groomer also testified that CPS had
talked about terminating Father=s parental rights prior to the April 30 episode
at the Ben Street office. 





[50]Father=s hours of community
service were initially deferred because of the stressful nature of the CPS
proceedings and the effect that they were having on Father. 





[51]Father was prescribed ten
milligrams of Abilify, a psychotropic medication, on February 12, 2009.  Father told Groomer that he was taking three
milligrams of Abilify. 





[52]Father wanted
unsupervised visitation with the children, and Oldham told him to have his
attorney file a motion for modification. 
Oldham said that he had no reason to agree to the recommendation for
Father to have unsupervised contact with the children based on the behavior
that he had observed.  Oldham noticed
that Father frequently became angry and had what appeared to be mood swings. 





[53]Father said that he did
not skip any pills.  He said that the
psychotropic medication causes a hand tick and a Avery strong aversion to
medication.@  He did not want to take the medicine, but he
took it because he loves his children and wants them back.





[54]Oldham said that he was
not denied access the other two times; one time Father was not home, and the
other time, Oldham had accompanied the transportation officer who picked up
Father and took him to the Department. 





[55]Oldham later reiterated
in his testimony that Father was up for a review, not a mandatory release, in
September 2009. 





[56]Although A.B. was three
and a half when he came to Jennifer H.=s house and was not fully verbal, he was able let
her know what his needs were and when he was unhappy. 





[57]From July 8 through the
end of September 2008, Father did not have visits with the children because he
was in jail.  Father=s visits began when he
was released from jail. 





[58]Jennifer H. said that the
investigators told her that Father made the anonymous referrals. 





[59]Jennifer H. said that
A.B. had a fear of bathrooms; he would resist when she put him on the toilet,
so she just let him wear pull-ups. 





[60]Mother said that Father
had dogs that lived inside the apartment. 





[61]Father said that he was
waiting to buy a bed for H.B. until he was sure he was getting his children
back. 





[62]Father stated that he no
longer had credit cards but admitted that he had credit card debt that had
accrued during his marriage.  His monthly
budget, however, did not include the amount that he would be paying toward that
debt.





[63]If Father=s parental rights were
not terminated, everyone agreed that it would not be in the children=s best interest for the
trial court to accept Mother=s relinquishment. 
However, Mother did not perfect an appeal.  Additionally, Gordon testified that Mother
told her that Mother had made a Adeal@ with CPS concerning her unborn child.  The details of any such Adeal@ were not made part of the
record.





[64]Groomer admitted that she
had no specific knowledge of Father=s income because he would not talk to her about
it; Groomer=s understanding was that
he received SSI payments. 





[65]However, Groomer agreed
that she did not Ahave any knowledge on
what the Court did in Missouri,@ and the record before us does not contain the
Missouri CPS records.





[66]The trial court made 145 Afindings of fact.@  They are primarily recitations and summations
of testimony presented during trial. 
Some of the  findings of fact are
inconsistent with other findings of fact; some are favorable to Father, while
others are favorable to the Department. 
The factual background of our opinion incorporates the trial court=s various findings of
fact, and we incorporate them in our legal and factual sufficiency analysis.

 





[67]During oral argument, the
State focused mostly on Father=s slap to A.B., H.B.=s failure to thrive, and
the domestic violence allegations. 





[68]The underfeeding is also
supported by the children=s eating habits that were
witnessed by the foster parents.





[69]The Department had
returned the children to Father approximately one month before Barker visited
them at Father=s apartment and reported
A.B.=s bruising.





[70]H.B.=s failure-to-thrive
diagnosis occurred when she was taken to the hospital by the paramedic.





[71]As mentioned earlier,
H.B.=s medical records
conflict with Mother=s testimony at trial; the
records reflect that Mother told medical personnel that Jennifer W. watched the
children while Mother was at work and that Father watched the children Asometimes.@ 





[72]See Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976) (listing
the parenting abilities of the individual seeking custody as a factor to be
considered in making a best interest determination).





[73]We note, however, that
the trial court did not require Burdick=s final report that was admitted into evidence to
be redacted, and it contains the following with regard to the polygraph exam
that Father took:

 

In March, [Father] spent
$500 to have a polygraph exam by Richard Wood. 
I encouraged [Father] to spend that money more wisely for the betterment
of his children.  He stated he was going
to prove that he did not hit his son.  I
also told him that the polygraph was inadmissible in court.  He has spent time assuring this counselor
that he pl[ed] guilty to Injury to a Child because he was told he had no
choice.  He sees this as another form of
victimization by the courts and CPS.  His
intent is to take the poly[graph] results back to the Judge that gave him
probation and prove he did not injure his son [in an attempt to] get the
conviction overturned.